Opinion
 

 PUGLIA, P. J.
 

 This case presents a microcosm of global themes; war and revolution, the clash of cultures, generational conflict, bureaucratic inflexibility and the enduring strength of maternal ties.
 

 Petitioner Nahid H. (mother) petitions for an extraordinary writ (Cal. Rules of Court, rule 39.1B; hereafter rule 39.1B) to compel respondent juvenile court to vacate its order setting a permanency planning hearing for her daughters Azadeh M. and Nadieh M. (Welf. & Inst. Code, § 366.26; further statutory references to sections of an undesignated code are to the Welfare and Institutions Code). Mother requests further that we order the dependency proceedings dismissed or, alternatively, direct the juvenile court to develop a reunification plan designed to bridge the physical and emotional rift between her and her daughters (the minors). For the reasons stated below, we shall order the juvenile court to vacate the order setting a permanency planning hearing and develop a reunification plan as requested.
 

 
 *1055
 
 Before reaching the merits, we address the request of real party in interest, Sacramento County Department of Health and Human Services (Department), that we dismiss the petition as facially insufficient. The petition is, at best, meager. (See
 
 Joyce G.
 
 v.
 
 Superior Court
 
 (1995) 38 Cal.App.4th 1501, 1508 [45 Cal.Rptr.2d 805] .)
 
 [1]
 
 It avers conclusionally that the court erred by failing to provide reunification services to the mother. The facts are sparingly summarized and there are no points and authorities (see rule 39.1B(j) [“Petitioner shall attach applicable points and authorities’’]). The Department urges that such a skeletal petition should be interred without further obsequies.
 

 In recent months several appellate decisions have questioned whether appellate courts should review the merits of appeals and writ applications lacking developed arguments.
 
 (In re Sade C.
 
 (1996) 13 Cal.4th 952 [55 Cal.Rptr.2d 771, 920 P.2d 716];
 
 Cresse S.
 
 v.
 
 Superior Court
 
 (1996) 50 Cal.App.4th 947 [58 Cal.Rptr.2d 56];
 
 Cheryl S.
 
 v.
 
 Superior Court
 
 (1996) 51 Cal.App.4th 1000 [59 Cal.Rptr.2d 520].)
 
 In re Sade C.
 
 held a dependency
 
 appeal
 
 is subject to dismissal as abandoned where counsel files a brief with a statement of the facts but no argument, and requests the appellate court independently to review the record for error pursuant to
 
 Anders
 
 v.
 
 California
 
 (1967) 386 U.S. 738 [87 S.Ct. 1396, 18 L.Ed.2d 493] and
 
 People
 
 v.
 
 Wende
 
 (1979) 25 Cal.3d 436 [158 Cal.Rptr. 839, 600 P.2d 1071]. Citing
 
 Sade C.,
 
 the court in
 
 Cresse S.
 
 stated, in dicta, that a rule 39.1B
 
 petition
 
 lacking an adequate record, argument and points and authorities should be dismissed.
 
 (Cresse S.
 
 v.
 
 Superior Court, supra,
 
 50 Cal.App.4th at p. 955.) Taking its cue from
 
 Cresse S.,
 
 the Court of Appeal in
 
 Cheryl S.
 
 announced it will dismiss any rule 39.IB petition which fails to include a factual summary, record references, and points and authorities relating any claimed error to the facts.
 
 (Cheryl S.
 
 v.
 
 Superior Court, supra,
 
 51 Cal.App.4th at p. 1005.)
 

 Attorneys representing parents or minors in dependency proceedings generally are paid less than the market rate established for legal services in other practice areas.
 
 (Cresse S.
 
 v.
 
 Superior Court, supra,
 
 50 Cal.App.4th at p. 956.) As a result many, if not most, attorneys, no doubt guided by an invisible hand, allocate a larger amount of their resources to more remunerative endeavors and less to those that are relatively unrewarding financially. Added to this economic pressure are institutional pressures for expedition (see rule 39.1B(k) [petition to be served and filed within 1Ó days after filing of record]) and for brevity, the latter encouraged by the Judicial Council form dependency petition (rule 39.1B(i)), which emphasizes blank-filling
 
 *1056
 
 and box-checking over detailed factual exposition and argument.
 
 [2]
 
 Although
 
 Wende
 
 review is not constitutionally required in dependency cases
 
 (In re Sade C., supra,
 
 13 Cal.4th at p. 994), use of the truncated Judicial Council form petition, without more, is the functional equivalent of a request for
 
 Wende
 
 review. Because of the importance of the rights at stake
 
 (id.,
 
 at pp. 987-990), reviewing courts are nevertheless inclined to respond by meticulously combing the record in search of error. Quite apart from the burden this practice gratuitously places on the court, the default of petitioner’s counsel also tends subtly to alter the institutional role of the court as neutral arbiter.
 

 Rule 39.1B(j) instructs counsel on the contents of the petition: “The petition for extraordinary writ shall summarize the factual basis for the petition. Petitioner need not repeat facts as they appear in any attached or submitted record, provided, however, that references to specific portions of the record, their significance to the grounds alleged, and disputed aspects of the record will assist the reviewing court and
 
 shall
 
 be noted. Petitioner
 
 shall
 
 attach applicable points and authorities. . . .” (Italics added.) Thus counsel are enjoined to function as professionals, not as mere scriveners.
 

 Nevertheless, we shall not exercise our discretion summarily to dismiss the petition (see
 
 Cheryl S.
 
 v.
 
 Superior Court, supra,
 
 51 Cal.App.4th at p. 1005). Insofar as the record shows, mother has never by act or conduct brought herself within the proscriptions of section 300. As will be shown, she is before the court precisely because she subordinated her maternal interests to the safety of her children. Given these unusual facts, a refusal to entertain this petition on the merits would risk grave injustice.
 

 Mother was bom in Iran 38 years ago. Her father is a successful businessman in Iran and provides financial support to mother as needed. The minors were bom in Iran following mother’s first marriage in the early 1980’s. Nadieh, presently age 14, was bom in May 1982, and Azadeh, presently age 13, was bom in January 1984.
 

 The minors had scarcely emerged from infancy when tragedy threatened the children of Iran. Iran was at war with Iraq. The war decimated the Iranian population. Children from age 13 were subject to involuntary service in the armed forces. The regime of the Ayatollah Khomeini pursued the war with a holy fervor. Children of all ages were bombarded with propaganda and forced indoctrination with the ideology of the Iranian revolutionary government.
 

 
 *1057
 
 Thousands of Iranians fled their homeland to escape the fundamentalist, anti-Western, Islamic regime headed by Khomeini. Mother, her husband, and the minors were among these refugees. They fled to Iraq, settling in Baghdad amidst a colony of Iranian refugees. Mother, who was trained as a schoolteacher, taught in a school with about 800 Iranian students. Conditions in the colony’s compound were spartan, but the compound was secure, for the Iraqi government was content to harbor those who sided with its cause.
 

 The colony was organized under the auspices of the National Committee of Resistance (NCR). The NCR was an organized group of anti-Khomeini Iranians with headquarters in France. The People’s Mujahedin Organization of Iran (PMOI) was a constituent part of the NCR. This group was also known as the Mujahedin, which means “Holy Warriors.” The Mujahedin existed as a government in exile on French soil and maintained an army. Many Iranians living in Baghdad supported the Mujahedin’s efforts to oust the Khomeini government.
 

 Iranian supporters of the Mujahedin were at grave risk if they were found within Iran’s borders. Convincing proof of this was shown by the circumstances of the father’s death in 1988. At that time, the mother, father, and minors had been living in the Baghdad refugee colony for some five years. The minors’ father received word from Iran that his father was seriously ill. He attempted surreptitiously to return to Iran to visit his father for perhaps the last time. He was identified at the border by revolutionary guards and summarily executed. The minors were three and five years old at the time of their father’s death.
 

 Approximately six months after her husband’s death, the mother remarried. It was reported that the minors’ stepfather was their natural father’s brother. The stepfather worked at a newspaper office in Baghdad.
 

 The mother and the minors continued to reside at the Baghdad colony until the Gulf War erupted in early 1991. Iraq attacked Kuwait and the United States joined with Kuwait to resist Iraqi aggression. As part of its assistance, the United States bombed military targets in Iraq, many of which were in Baghdad. Bombs rained down on the capital city, and some landed within meters of the school where mother taught.
 

 Iranians in the Baghdad colony sought assistance from the Iraqi government. Some fled to Turkey and sought assistance from officials of the United Nations. Others asked the Mujahedin leaders for assistance. Escape was particularly difficult for undocumented Iranians such as mother and the minors. Mother contacted her father in Iran and asked if he would come to
 
 *1058
 
 Iraq and take the minors to a neutral country. Her father offered to shelter the minors in Iran, but he could not take them to a third country because of business commitments.
 

 Mother refused to allow her children to return to Iran, so she searched for alternatives. Several days after the bombing started, mother heard of a plan to send Iranian children by an escape route into Jordan. Once in Jordan, the children would be retrieved by, or transported to, relatives or friends in different parts of the world.
 

 Mother, having escaped to Iran’s enemy Iraq during the war between those two countries, now sought to send her children to the United States during its war with Iraq. She contacted a childhood friend, Ahmed, who had fled to the United States from Iran more than 10 years earlier. Ahmed lived in El Cerrito with his wife and two teenage boys. Tradition discouraged placing the two young girls in a home with teenage boys, so she asked Ahmed if he knew of any other Iranian family where the minors could safely be placed. Ahmed told mother of his friend Parvin, who lived in Sacramento with her husband Javad. Mother telephoned Parvin and explained her predicament. Parvin assured mother that the minors would be safe with her, and that they would remain sheltered from the decadent American lifestyle.
 

 Satisfied with Parvin’s assurances, and having no other alternative, mother arranged passage of the minors along the escape route to Jordan. From Jordan, the minors were transported to an orphanage in Paris, France, where they were provided with false passports. Parvin flew to Paris, took custody of the minors, and returned with them to the United States.
 

 Mother was able to maintain intermittent contact with Parvin from Iraq. She wrote letters every few months. She also received periodic reports on the minors’ progress from an Iranian woman she had known in Baghdad. The woman, who had a Dutch passport, was able to flee Iraq with her family and move to Northern California in the wake of the Gulf War in early 1991. During the next few years, the woman and her daughter (who was Nadieh’s age) visited with the minors in Sacramento. The minors always asked about their mother.
 

 Parvin enrolled the children in school. Unknown to her, her husband, Javad, took a perverted interest in the elder girl, Nadieh, who was then eight years old. The accounts of what transpired differ. Two years later, Nadieh told her teacher that Javad had raped her several times during the preceding two years. In accounts to others, Nadieh explained that on several occasions Javad had fondled her breasts through clothing and had rubbed his penis against her underpants.
 

 
 *1059
 
 After Nadieh complained to her teacher, the Department was contacted and dependency proceedings were commenced. The petition relating to Nadieh alleged that Javad had performed lewd and lascivious acts upon her during the preceding two years, including but not limited to fondling and sexual intercourse, with the last act occurring on November 29, 1992. This allegation was the predicate for jurisdiction under section 300, subdivision (b) (failure to protect) and subdivision (d) (sexual abuse). Jurisdiction under subdivision (g) (no provision for support) was based on the following allegations: “Said minor’s natural parents, Nahid and Bahroos M[.], reside in Iran and have been deprived of lawful custody of said minor. Further, their exact whereabouts, willingness, and/or ability to provide for the care or supervision of said minor are unknown.” These same allegations were repeated in the dependency petition filed as to Azadeh. An additional basis of jurisdiction alleged as to Azadeh was section 300, subdivision (j) (abuse of sibling).
 

 When mother’s El Cerrito friend, Ahmed, received word of the dependency proceedings, he wrote to mother and explained the situation. Mother contacted a female acquaintance, Ensieh, who lived in Richmond, and related that she was unable to leave Iraq without a passport or visa. Ensieh contacted the social worker before the jurisdictional hearing and told him that mother was attempting to travel to the United States to retrieve her children, but that it was extremely difficult to obtain a visa due to the wartime conditions. Ensieh requested that the children be placed in her custody or with an Iranian family she knew in San Jose. Ensieh had visited the minors recently and they had expressed a desire to be with their parents, or at least with a non-American family.
 

 This exchange was detailed in the social worker’s report for the January 1993 jurisdictional hearing. The report also stated that mother had sent the minors to live with Parvin and Javad two years earlier to escape the war. Mother had informed the minors that she did not want them to live with an American family.
 

 At the jurisdictional hearing held in January 1993, the court declared the minors dependents and ordered them to participate in a program of professional counseling focusing on issues of sexual abuse, victimization, and abandonment. Reunification with the parents was conditioned on ascertaining their whereabouts.
 

 The minors were initially placed with the teacher to whom Nadieh had reported the molestation. Thereafter the Department acceded to the minors’ wishes and placed them in a foster home where the foster mother was of
 
 *1060
 
 Iranian and Turkish descent. The foster mother spoke Farsi, which facilitated communication with the minors.
 

 A few months later, in late May 1993, the minors received a telephone call at their foster home from a woman who claimed to be their mother. The caller stated that a man would meet with the social worker and request that the minors be placed with an Iranian family in San Jose. The caller informed the minors they should agree to the placement. The caller also told Nadieh that she was of an age where she could return to Iraq. The minors reported the call to the social worker, and stated they did not believe the caller was their mother. Nevertheless, the call was upsetting, particularly to Nadieh. A few months earlier, Nadieh had received a letter from her mother stating that a girl two years older than Nadieh had recently joined the Mujahedin, and it was the mother’s hope that Nadieh would consider joining the organization. Nadieh also was upset because mother had promised that she would join the minors a month after they arrived in Paris, but now two years had passed. Nadieh had given up hope of ever seeing her mother again.
 

 Dependency jurisdiction was continued at the six-month review hearing in July 1993 based on the stipulation of the Department, the guardians, and the minors. The social worker’s report disclosed no progress in locating the minors’ parents. Search efforts had included contacting the Red Cross as well as Iranian officials in Washington, D.C. The minors did not appear to have any relatives living in the United States. Javad, whose molestations had provoked the dependencies, could not be reached and it was believed he had fled the country.
 

 During the same month, Ahmed approached the social worker on mother’s behalf. Ahmed testified he informed the social worker that he did not have direct contact with mother, but that he could relay messages to her. The social worker replied that mother would have to come to California in order to regain custody of the minors. Ahmed explained this would be impossible because the mother was marooned in Iraq. During another visit, Ahmed presented the social worker with a document, written in Arabic and English, which purported to delegate to Ahmed mother’s power of attorney with respect to the minors. The social worker told Ahmed the document did not give her power to transfer custody of the minors to him. Ahmed reiterated that mother could not leave Iraq without papers. He told the social worker mother would come to California if the Department could secure a visa for her. According to Ahmed, the social worker said she would look into it.
 

 The social worker recounted her meetings with Ahmed in the report prepared for the October 1993 review hearing. The social worker related that
 
 *1061
 
 the minors were fearful of Ahmed. They said he attended political meetings in Iraq and he frequently marched on the state capítol with other Iranians. The social worker wrote that she had offered to assist Ahmed in any way possible to hasten mother’s journey to the United States, but Ahmed had seemed to imply mother was unwilling to come here.
 

 The court continued dependency jurisdiction in November 1993 and set a 12-month review hearing for January 1994. The January hearing went forward as scheduled and dependency jurisdiction was continued, based on the stipulation of the Department and the minors, who agreed to be bound by the recommendations in the social worker’s report. One of those recommendations which the court adopted was that reunification services to the parents be terminated. Long-term foster care remained as the preferred permanent plan based on the minors’ unstable legal status and the parents’ unknown whereabouts.
 

 The report for the January 1994 hearing related that the minors appeared to be well adjusted in their foster home where they resided together. Nadieh, a sixth-grader, was very sociable, and had enjoyed recent trips to Los Angeles, Lake Tahoe and other places. She had gone to a Christmas party and received many presents. She also spent a good portion of the Christmas vacation with the foster mother’s daughter, who was home for the holidays from college. Azadeh, who had entered the fourth grade, also enjoyed travels and Christmas holidays.
 

 Mother escaped from Iraq in early 1994, about a year after the minors had been declared dependents, and three years after they had fled to the United States. According to mother, she had hoped to leave Iraq shortly after the Gulf War ended, but her hopes were dashed by the constant state of emergency there. No one was permitted to leave the country without proper papers. With the help of relatives, though, mother crossed the Turkish border illegally. The relatives arranged for mother to get a false Iranian passport and visa while in Turkey, and then to travel to Germany.
 

 Ahmed and his cousin Simin visited the social worker in May 1994 and asked that the minors be placed in Simin’s custody at her Orange County residence. They informed the social worker that mother had escaped from Iraq and would travel to the United States if she were able to secure the needed papers, but that prospects were bleak.
 

 The social worker wrote of her meeting with Ahmed and Simin in the report prepared for the 18-month review hearing in July 1994. The prospect of potential reunification of the minors with their mother was a cause of
 
 *1062
 
 some concern to the social worker and her supervisor. The minors had informed the social worker that they missed their mother but did not wish to reunify. According to the minors, their mother was one of the leaders of the Mujahedin military, and would surely return them to Iraq for Mujahedin indoctrination to prepare them for service in the military. The foster mother confirmed that the minors were at the age where the Mujahedin organization begins to brainwash children to serve the movement.
 

 At the July 1994 review hearing, the court ordered long-term foster care as the permanent plan for the minors.
 

 Mother’s first direct contact with the social worker occurred in October 1994, when mother telephoned from Germany and left a voice mail message for the social worker. Mother introduced herself in English and asked to speak with the minors. The social worker tried to return mother’s call several times without success. She finally spoke directly with mother in early December 1994. The initial conversation with mother concerned the well-being of the minors. Mother wanted to know the details of the molestation of Nadieh as well as the consequences for the perpetrator. Mother indicated she wanted the minors with her in Germany. The social worker asked about mother’s involvement in the Mujahedin, and mother stated it was minimal. Mother stated that she intended to come to the United States, but she wasn’t sure how many months it would take, as she was a political refugee in Germany and did not have the papers required for passage to the United States.
 

 The social worker explained what would be required in order to reunify with the minors. First, the minors would have to identify her. If they could not, blood tests could be ordered. Once it was established that she was the mother, there would be further discussions regarding what steps would be taken to reunify.
 

 As to the first condition, mother gave identifying information about the minors, and asked to speak with them so they could verify she was their mother. The social worker contacted the minors and asked them if they wanted to talk to their mother. When they declined, the social worker dropped the matter.
 

 An administrative review (§ 366.3, subd. (e)) of the minors’ placements was conducted in January 1995, with no change recommended. In a report prepared for the review hearing, the social worker detailed Azadeh’s emotional reaction to placement with her sister in a new foster home. The former foster home was inappropriate due to licensing violations. Azadeh threatened
 
 *1063
 
 to kill herself if moved, since she had been the favored child. However, she was able to bond with the new foster mother during visits with her sister. The new foster mother was Caucasian and the foster father Hispanic. The foster parents respected the minors’ cultural differences. The social worker indicated that placement with a non-Iranian family was deemed the safest option since it would be nearly impossible to ascertain whether an Iranian family was aligned with the Mujahedin. The minors had not had any contact with their mother, and did not want to read any of her letters that mentioned the Mujahedin, since they were fearful of being impressed against their will into service with that organization. The minors also were angry at their mother for sending them to America to live with a man they described as sick-minded and nasty.
 

 The report spoke of the social worker’s conversations with mother: “The woman stated that she was residing in Germany and planned to come to the United States to get her children. The woman claimed the minors’ father was executed by Khomeini for his participation in the [PMOI]. She indicated that she and the girls escaped Iran with nothing but the clothes on their backs. Therefore, legal documents such as birth certificates were unavailable. The woman asked if she could have telephone contact with the girls. The undersigned told the woman that the girls did not wish to have telephone or face-to-face contact with her. However, the woman was told she could send letters.”
 

 Without credible foundation, the report then delivered a grim assessment of the conflict between the Mujahedin and the Iranian government: “Mother’s participation in the People’s Mojahedin [sic] Organization of Iran presents a very real danger to the girls. Mojahedin [sic] supporters are raped, tortured and executed on a regular basis. The Iranian government believes that children nine years and older are eligible for arrest, imprisonment, rape, torture and execution if it is believed they are associated with the PMOI. Therefore, the girls’ very lives are in danger because of the mother’s political participation in the PMOI. The Iranian government considers the girls supporters of the PMOI because of their mother’s active participation in the organization. Should the mother arrive in the United States to take the girls with her, they will be forced to dedicate their lives to this organization. Azadeh and Nadieh do not wish to have any part of this, nor do they wish to be associated with the PMOI. Therefore, it is not in the minors’ best interest to facilitate reunification with the mother.”
 

 The social worker testified that mother’s letters contained references to the Mujahedin. An excerpt of one of mother’s letters received in mid-1994 was translated as follows: “Dear Nadieh: I don’t know if you’re going to the
 
 *1064
 
 organization’s meeting or not, but if you don’t, make sure you do it and help your uncles and aunts with the organization work. [<]□ Tel is now in Paris and working with the organization. [<JD I don’t know if you heard the news of your sister Marian coming to France. I think you must have heard about it. [H My wish is you to go to the meetings of our organization and work there like other children.”
 

 Nadieh responded to her mother with a letter which states in part: “I wear makeup. I wear lipstick and eyeliner and nail polish. Mom, is very different here, [sic] I am considered a teenager. And we do all of these things. I even have a boyfriend. Mom, I really hate this organization you work with, the Mojahedin [sic]. fiD They have messed up my life too. They’re the ones that separated us anyway. I am sure you don’t like them for that. [<]]] Mom, this is really from the bottom of my heart—of my heart. [^] I would love to live with you. I would like a normal family, but only if you stop this Mojahedin [sic] thing, and you come here to America. I do not want to be part of that organization. Mom, if you love your kids, me and Azadeh, you would quit that thing. I don’t—I don’t see why you would want to kill people just because they believe in different things than you. They really scare me.”
 

 In another letter to the minors, mother wrote she was sorry she could not come to America sooner, but she was very busy, and she hoped the minors would forgive her. The Department took the view that this letter showed mother could have come to the United States earlier if she had really wanted to do so. Mother later offered the following explanation: “It was very hard at that time when Nadieh leave me. [sic] It was very hard, very bad time, and we were all crying. We were very sad about that, and I never told Nadieh that I don’t have any passport. [<j[] I am not able to come after that. When I was in Iraq at that time, if I would have told her, then she would know that I wouldn’t have opportunity to join her so soon, and she would be very sad. HD That was kind of an excuse I was writing her, that I am busy here. I can’t come to her right now, because I wanted to keep her happy, and I hope that one day I would be able to do that.”
 

 On May 2, 1995, the social worker received a telephone call from mother, who was still in Germany. Mother asked for an update on the minors. The social worker explained that the minors did not want to be in her care. Mother responded that they would change their minds if she was allowed to meet with them.
 

 Mother asked the social worker to write to the American consulate, since it wanted to verify why mother was attempting to enter the United States. The social worker told mother that she should use the resources of the
 
 *1065
 
 Mujahedin. Mother replied that she was no longer involved with them. The social worker did not write a letter on mother’s behalf because she had no way of verifying that the person who was calling was the mother of the children. The social worker did, however, send mother notices of review hearings, and those documents were enough to induce the consulate to issue mother a visa. Thus, in early June 1995, mother telephoned the social worker and told her she had obtained a visa and would be entering the United States in July.
 

 In the report filed on July 7, 1995, for the review hearing (§ 366.3, subd. (e)) that day, it was reported that the minors and mother had exchanged correspondence. The minors remained fearful of their mother based on their belief that she would take them to Iraq to serve in the Mujahedin. The mother had sent them a book describing the Mujahedin. The social worker concluded mother clearly loved the minors but her allegiance to the Mujahedin took precedence. The court continued dependency jurisdiction by order dated July 7, 1995.
 

 A few days earlier, on July 4, 1995, mother had arrived in the United States. One week later mother met with the social worker, who informed her the minors were adamant in their refusal to have contact or live with mother.
 

 The social worker managed to persuade the minors to meet their mother in the latter part of July 1995. The minors were able to identify their mother at this initial reunion. After the initial meeting, Azadeh did not wish to have any more contact. Nadieh was more amenable.
 

 After the daughters verified mother’s identity, the social worker “did not move forward with reunification because the girls did not wish to pursue reunification.” Therefore, there were no discussions regarding reunification. The social worker testified: “Without their consent to reunify, it would be a detriment to their emotional well-being to pursue that.”
 

 In subsequent conversations, the minors confronted their mother about her involvement with the Mujahedin, and they wrote letters telling her they did not want to live with her. One of mother’s responses was to remind them that their father had been executed by the Khomeini regime.
 

 Following appointment of counsel for mother in August 1995, several months passed while counsel familiarized himself with the case. Jurisdiction was continued by stipulation of the parties.
 

 In February 1996, the court ordered that there be no face-to-face contact between mother and the minors unless the minors requested it.
 

 
 *1066
 
 Mother retained new counsel in February 1996. The court was informed mother would be filing a motion for modification under section 388. Review of the matter was continued several times.
 

 On April 4, 1996, mother filed a section 388 petition to set aside the dependencies or, alternatively, to develop a reunification plan. Mother argued that the grounds upon which the dependencies had been predicated no longer existed. She also noted no reunification plan had been devised since her arrival in the United States.
 

 In July 1996, mother told the social worker that she had separated from her husband, who was still in Germany. She said he was still fighting for the cause, that he did not wish to come to America to be with mother and her daughters, and that consequently they had separated. Mother indicated she was trying to acquire legal permission to stay in the United States. At one point mother indicated she had secured employment.
 

 Before the hearing on the section 388 petition, the Department requested a change in the permanent plan from long-term foster care to adoption. The ostensible basis for the request was that legal barriers to the adoption of the minors had been removed.
 

 The court considered the section 388 petition and the proposed change in the permanent plan in conjunction with the regularly scheduled review hearing. (§ 366.3, subd. (e).) The court denied the section 388 petition due to the passage of time. The court found there was little evidence presented as to whether reunification would be the best alternative for the minors. The court stated that the minors had entered this country under less than ideal circumstances; the elder had been molested; the minors had bonded to their present caretakers; and the minors would be returned to a psychological and emotional limbo if there were a renewed reunification process. By clear and convincing evidence, the court found that the conditions still existed which justified initial assumption of jurisdiction under section 300, or would be likely to exist if supervision were withdrawn.
 

 I
 

 In her writ petition as well as a reply brief prepared by newly retained counsel, mother argues dependency proceedings should be dismissed or, at least, a reunification plan should be developed.
 

 The Department responds that substantial evidence supports the juvenile court’s decision to deny such relief. The Department notes mother had the
 
 *1067
 
 opportunity to engage in reunification for one year following commencement of dependency, and the obligation to provide services ceased upon the court’s order terminating reunification services in January 1994. The Department proposes that one year of reunification services was reasonable, particularly since there was evidence mother knew of the dependency proceedings from the outset and she chose to remain in Iraq and Germany in order to assist the Mujahedin. Once reunification services were terminated, the argument proceeds, the focus turned to the best interests of the minors, which in this case favors adoption. The Department concludes that substantial evidence supports the juvenile court’s finding and that no abuse of discretion appears.
 

 A
 

 “The federal and state Constitutions guarantee that no state shall deprive any person of life, liberty or property without due process of law. [Citation.] A parent’s interests in the companionship, care, custody and management of his children is a compelling one, ranked among the most basic of civil rights. [Citation.] Likewise, natural children have a fundamental independent interest in belonging to a family unit [citation], and they have compelling rights to be protected from abuse and neglect and to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child. [Citation.] The interests of the parent and the child, therefore, must be balanced.”
 
 (In re Marilyn H.
 
 (1993) 5 Cal.4th 295, 306 [19 Cal.Rptr.2d 544, 851 P.2d 826].)
 

 “[O]ur statutory scheme expresses a presumption in favor of keeping parents and children together. The burden of proof is on the Department to show that an out-of-home placement is necessary at the commencement of the proceedings (§ 361); and, at the mandatory review hearings every six months thereafter, the presumption is that the child should be returned to the parent unless the Department demonstrates that the child’s return would ‘create a substantial risk of detriment to the [child’s] physical or emotional well-being.’ (§§ 366.21, subds. (e) & (f), 366.22, subd. (a).) Nonetheless, the Legislature also recognizes the child’s interest in a stable, permanent home (§ 366.25, subd. (a)), and has provided that the juvenile court should avoid delay and ‘give substantial weight to a minor’s need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to the minor of prolonged temporary placements.’ (§ 352, subd. (a).) The current statutory scheme makes it clear that the turning point at which the child’s interest may outweigh that of the parent is reached no later than 18 months after the child has been removed from the parental home, because the maximum length of time that reunification services are provided to the parent is 18 months. (§§ 361.5, subd. (f),
 
 *1068
 
 366.21, subd. (f), 366.22, subd. (a), 366.26; see also
 
 In re Marilyn H., supra, 5
 
 Cal.4th at p. 309.)”
 
 (In re Jasmon O.
 
 (1994) 8 Cal.4th 398, 420 [33 Cal.Rptr.2d 85, 878 P.2d 1297].)
 

 A slightly different situation is presented in cases where, as here, the court has selected a permanent plan of long-term foster care without termination of parental rights. In such cases, parents continue to receive notice of regularly-scheduled review hearings in which they are entitled to participate. (§ 366.3, subd. (e)(4).) At the hearing, the court is required to inquire about the progress being made to find a permanent home for the minor.
 
 (Ibid.)
 
 The court must determine the appropriateness of the placement, the continuing appropriateness of the permanent plan, the extent of compliance with the child welfare services case plan, and the adequacy of services provided to the minor. (§ 366.3, subd. (e).) The statute provides; “It shall be presumed that continued care is in the interests of the minor, unless the parent or parents prove, by a preponderance of the evidence, that further efforts at reunification are the best alternative for the minor. In those cases, the court may order that further reunification services be provided to the parent or parents for a period not to exceed six months.” (§ 366.3, subd. (e)(4).)
 
 [3]
 

 This standard mirrors the standard applicable to petitions to modify under section 388. A dependency order may be modified if a person shows a change of circumstances or new evidence which establishes that modification of the prior order is in the minor’s best interests. (§ 388;
 
 In re Jasmon O., supra,
 
 8 Cal.4th at pp. 415-418.) The moving party, in this case mother, has the burden of showing by a preponderance of the evidence that modification is warranted.
 
 (In re Audrey D.
 
 (1979) 100 Cal.App.3d 34, 43 [160 Cal.Rptr. 802]; Cal. Rules of Court, rule 1432(f).) The juvenile court has broad discretion whether to sustain the petition to modify its prior order. The court’s determination will not be disturbed absent an abuse of discretion.
 
 (In re Stephanie M.
 
 (1994) 7 Cal.4th 295, 318 [27 Cal.Rptr.2d 595, 867 P.2d 706].)
 

 An order denying a section 388 petition is appealable, of course, and appellate review is in almost all cases deemed an adequate remedy. The present case is exceptional, however, due to the facts underlying the dependencies, the current age of the minors, mother’s assertion that the facts do
 
 *1069
 
 not support jurisdiction, her blamelessness in respect to the jurisdictional facts, and the likelihood that adoption will occur absent our intervention. In such a case, the irreparable harm caused by our failure to act far outweighs any harm that, speculatively, may inure to the minors from undertaking reasonable efforts to reunite with their natural mother. (Code Civ. Proc., § 1086;
 
 Phelan
 
 v.
 
 Superior Court
 
 (1950) 35 Cal.2d 363, 370 [217 P.2d 951].)
 

 B
 

 Although not dispositive, there is little support for the juvenile court’s finding that the conditions warranting assumption of original dependency jurisdiction exist. There was no assertion or evidence that return of the minors to mother’s care would pose a risk of sexual abuse (§ 300, subd. (d)) or a lack of care or support (§ 300, subd. (g)), which were the original bases of jurisdiction. The record also offers scant support for the suggestion that mother’s purported involvement with the Mujahedin would cause serious physical harm (§ 300, subd. (b)) or emotional damage (§ 300, subd. (c)) to the minors if they were returned to mother’s care.
 

 The precise nature of mother’s involvement with the Mujahedin was hotly disputed in the juvenile court. Mother testified, and other evidence corroborated, that her involvement was limited to sympathizing with the goals of the Mujahedin. Other evidence adduced to show more active involvement was exceedingly exiguous: The minors mentioned their father wore a uniform and carried weapons, and that he might have been a bodyguard; the minors also recalled that mother and her friends attended and held political meetings supporting the Mujahedin; mother also wrote letters to the minors suggesting that they consider joining the Mujahedin and supporting the cause.
 

 The significance of mother’s involvement in the Mujahedin stems from the Department’s assertion that the minors would be at risk if returned to mother’s care (permanently or through unsupervised visitation) because mother might return with them to Iraq and join the Mujahedin’s fight against the government of Iran. The Department presented mostly speculation and anecdote to support this assertion. Testimony from mother’s friends dismissed the Department’s position as fantasy. The juvenile court declined to make an express finding on the point. The court stated: “Counsel, we are not going to litigate these foreign policy issues. Quite frankly, Counsel, my interest is the best interests of these children, [f] And what concerns me primarily is their disinclination to live with their mother. The basis for it is not nearly as important as the fact that these girls have made it repeatedly clear they do not wish to live with their mother.”
 

 The record supports the finding that the minors did not wish to return to mother’s care—at least so long as she continued to be involved with the
 
 *1070
 
 Mujahedin. But the court did not make ancillary findings that mother continued to be actively involved in the Mujahedin and that such involvement posed a serious risk of physical or emotional harm to the minors. The court was content to rely on the minors’
 
 perceptions of risk
 
 rather than actual evidence of risk. This does not suffice.
 

 Parents may entertain beliefs and engage in activities with which their children disagree, including political beliefs and activities. One need only recall the student protests over the Vietnam War in the 1960’s to recognize that serious political differences can arise between the generations within a family. But no one would seriously propose that political differences between parent and child—even major ones—would support the dependency jurisdiction of a juvenile court, absent a substantial risk of palpable harm to the child. And we have noted that the evidence of risk of physical harm was speculative and no such risk was found as a fact by the court.
 

 The record also provides little support for the Department’s position that if the minors were returned to mother’s care, they would suffer serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior. (§ 300, subd. (c).) The record is remarkable for the absence of psychological evaluations or structured therapy involving either the mother or the minors to ascertain and ameliorate the causes of the estrangement between them.
 

 If ever a case called for reunification efforts, this is it. Mother rescued her children from the perils of war, in the process enduring a protracted separation from them. Yet the Department taxes her with failure to come to the United States sooner than she did despite evidence that it was not possible for her to do so. The Department also insists that mother distance herself from organized efforts bent on installing a different political order in her homeland. When the social worker who has handled this case for the past several years was asked if there was anything about mother’s actions which made her an unfit parent, the social worker responded: “I felt that her choice to be involved in this organization led her to place herself and her children in an unsafe situation, which ultimately led her to send the kids to America for their safety.” The internal contradiction in this criticism is glaringly apparent. How a mother who temporarily sacrifices a close relationship with her children in exchange for their safety is thereby rendered unfit escapes us. We suggest that so long as mother acts within the law, her political beliefs and affiliations are none of the Department’s business.
 
 [4]
 

 From the outset, the Department has sided with the minors and viewed mother’s claims with suspicion and disbelief. The minors have repeatedly
 
 *1071
 
 been given veto power over contact with mother based on their childhood memories of mother’s involvement with the Mujahedin and her requests that they consider joining the organization. The juvenile court, similarly, gave undue weight to the wishes of the minors. As the court stated: “I am concerned about the girls’ perceptions and whether the perceptions are valid is of no real consequence. I want to know if they are, in fact, afraid. [tJQ That is all. And I do not wish to litigate the Iranian government or the PMOI or any issues of that nature. [*][] I really don’t.”
 

 To this day, the Department has continued to insist that the one year of reunification services offered to mother at the outset of the dependencies fulfilled its obligations—even though during that time mother was trapped in Iraq. It is true the record shows mother was aware at an early stage that dependency proceedings had been commenced. Throughout the proceedings she sent emissaries to retrieve the minors from the Department’s care. Each time her efforts were rebuffed by the Department, which insisted, and reasonably so, that mother contact it directly. But when mother finally made direct contact, the Department was recalcitrant. At first it needed to verify mother’s identity. Mother provided identifying information and asked to speak by telephone with the minors. The Department refused. The Department told mother she had to come to the United States. Mother asked for a letter so she could obtain a visa. The Department refused,
 
 suggesting that Mother seek assistance instead from the Mujahedin.
 
 Mother was informed that reunification would depend on the minors’ wishes. After a few visits, reunification efforts stopped. Mother asked for more visits. The Department refused.
 

 It is true that the Department was not obligated to formulate a reunification plan once reunification services were terminated in January 1994. However, the court had the authority to offer further reunification services if the mother proved it was in the minors’ best interests. (§ 366.3, subd. (e)(4).) We believe the juvenile court erred in concluding that further reunification efforts were not in the minors’ best interests. As noted, the care and companionship of a natural child is one of a parent’s most basic rights, which must be balanced against the child’s fundamental, independent interest in belonging to a family unit, being protected from abuse and neglect, having a placement that is stable and permanent.
 
 (In re Marilyn H., supra,
 
 5 Cal.4th at p. 306.) The court gave undue weight to the minors’ desires not to visit with their mother and too little weight to the potentially positive influence that the natural mother can have on the minors’ lives now that she has joined them in the United States. At present their relationship is suffused with resentment and fear and plagued by conflicting values. With time,
 
 *1072
 
 expert individual and joint counseling, and an intelligent reunification plan, the parental ties may well be reestablished. With maturity, the minors may more readily recognize the value of the natural bond they have with their mother even if their political beliefs are never reconciled. To foreclose this possibility without even making an effort to bring it about disserves the interests of all parties.
 

 II
 

 From what we have said, it is obvious we believe summary dismissal of the dependency proceedings at this stage would not be in the minors’ best interests. Mother did not show what impact that remedy would have on the minors, and considering the length of the separation and the minors’ alienation from her, we indulge the statutory presumption that continued care is in the minors’ best interests. (§ 366.3, subd. (e)(4).) Therefore, the modification petition was properly denied to the extent it sought dismissal of dependency. To the extent it sought, alternatively, formulation of a reunification plan, it duplicated necessary review under section 366.3, subdivision (e). It, too, was properly denied.
 

 Ill
 

 As the juvenile court observed, this truly is a difficult case and, we might add, one presenting unique problems and challenges. The case now before the court is wholly different from the case that justified the original assumption of jurisdiction. Thus, it is important for the Department to make a fresh start. This may require reassignment of the case to social workers who are utterly without preconceptions and who will not reflexively conclude the best interests of the minors can be served only within the cultural milieu of this society and the political system of this jurisdiction. Juvenile dependency law does not codify the dominant culture or the regnant political system.
 

 Let a peremptory writ of mandate issue commanding respondent juvenile court to vacate its order setting a hearing pursuant to section 366.26, and to order development of a reunification plan designed to overcome the conditions that have made continued dependency a necessity. This decision is final forthwith. (See Cal. Rules of Court, rule 24(d).) The previously issued stay of the section 366.26 hearing is dissolved as moot.
 

 Nicholson, J., and Callahan, J., concurred.
 

 [1]
 

 The better to illustrate “meager” in this context, the petition, with the surnames of the parties redacted, is annexed to this opinion as an appendix.
 

 [2]
 

 Form pleadings are useful in providing an organizational framework for the statement of a substantive right, but they cannot substitute for and must be supplemented with reasoned legal analysis and argument of facts and law.
 

 [3]
 

 In an analogous context, it has been held, notwithstanding a specific statutory time limit on reunification services, that the Legislature did not intend to exalt expediency over family reunification.
 
 (In re Daniel G.
 
 (1994) 25 Cal.App.4th 1205, 1213-1214 [31 Cal.Rptr.2d 75].) Thus, although circumstances did not justify the return of dependent children to their parent at the conclusion of the 18-month review hearing (§ 366.22), the court, in its discretion, could extend the reunification period beyond the statutorily authorized 18 months.
 
 (In re Elizabeth R.
 
 (1995) 35 Cal.App.4th 1774, 1789-1796 [42 Cal.Rptr.2d 200].)
 

 [4]
 

 Great Britain went to war in 1939 against Germany. During the war, London and many other British cities were bombed, taking a heavy toll of civilian casualties. Many British children were sent to Canada early in the war for their protection. When the war was over, it is not recorded that British parents who stayed behind actively supporting and participating in
 
 *1071
 
 the war effort had to justify themselves to Canadian social workers to secure the return of their children.