Filed 7/31/14  In re Joseph C. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re JOSEPH C., a Person Coming Under the Juvenile Court Law. | B252913 |
| | (Los Angeles County Super. Ct. No. CK90366) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. STACY S. et al., Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Carlos E. Vazquez, Judge.  Affirmed.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant Stacy S.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant Andrew C.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Kim Nemoy, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Stacy S. (mother) and Andrew C. (father) appeal the denial of mother's Welfare and Institutions Code section 388 petition to reinstate her family reunification services.[1] Because we conclude that the juvenile court did not abuse its discretion in denying mother's petition, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.   Detention, Jurisdiction, and Disposition

Joseph C., born in October 2008, is the son of mother and father. The family initially came to the attention of the Department of Children and Family Services (DCFS) in July 2009, when Joseph was less than a year old, mother was 16 years old, and father was 18 years old. Father received family maintenance services until March 2010, when he was arrested for felony vandalism and sentenced to five years in state prison. Mother received family maintenance services until April 2010, when she was arrested and cited for possession and sale of Ecstasy. After her arrest, mother was released home and provided additional services, and Joseph was placed with a paternal cousin. In May 2011, Joseph was returned to mother's care.

On October 11, 2011, Joseph's paternal grandfather reported that mother had left Joseph with him five days earlier and had not returned. Mother had left Joseph without shoes, socks, or a change of clothes; Joseph had not recently been bathed and appeared to be wearing the same clothes he had worn days earlier. Mother had not said where she was going or when she planned to return, and paternal grandfather had not been able to reach her by telephone or text message. Paternal grandfather said he could not explain

---

[1]   All subsequent statutory references are to the Welfare and Institutions Code.

mother's behavior, but he knew she had been kicked out of her mother's home in the past for using drugs.

On October 12, 2011, mother appeared at paternal grandfather's home, banging on the front door and yelling from outside the home. When DCFS arrived, mother refused to drug test because "the test will come out dirty." On October 13, 2011, mother tested positive for marijuana, and on October 15, 2011, she failed to appear for an on-demand drug test.

At a team decision making meeting on October 13, 2011, the paternal and maternal grandfathers said mother had behaved unpredictably over the last several weeks. Mother denied having a drug problem and refused to participate in substance abuse treatment. She also refused to live with maternal grandfather, even though she admitted she did not have any place else to live. Based on mother's unwillingness to address safety and other issues, Joseph was detained and placed with paternal cousins.

The juvenile dependency petition, filed October 18, 2011, asserted jurisdiction over Joseph pursuant to section 300, subdivision (b). It alleged: "[Joseph's] mother, Stacy [S.], has a history of illicit drug abuse including [E]cstasy and is a current abuser of marijuana, which render[] the mother incapable of providing regular care for the child. Remedial services failed to resolve the family problems in that the mother continues to abuse illicit drugs. The mother's use of illicit drugs places the child at risk of harm."[2] On October 18, 2011, the juvenile court found a prima facie case for detaining Joseph and ordered mother to participate in parenting classes and weekly random drug testing.

At the jurisdiction/disposition hearing on December 5, 2011, the juvenile court sustained the amended petition and found Joseph to be a dependent child under section 300, subdivision (b). The court further found by clear and convincing evidence that substantial danger existed to Joseph's physical health, and no reasonable means existed to protect him without removing him from his parents' physical custody. The court granted

---

[2]     An additional allegation, that mother left Joseph with his paternal grandfather without making an appropriate plan for his care, was stricken from the complaint and is not relevant to this appeal.

mother monitored visitation and ordered her to participate in individual counseling, parenting classes, drug counseling, and weekly random drug testing.

## II.     Six-Month Review

The June 5, 2012 status review report stated that mother did not have stable housing and lived at various times with each of her parents. She visited Joseph only intermittently. Mother had enrolled in an outpatient substance abuse treatment program in November 2011, but had been terminated from the program in January 2012 for excessive absences. Mother had not attended parenting education, individual therapy, drug treatment, or Narcotics Anonymous (NA) meetings, and she had failed to appear for any on-demand drug tests between December 2011 and May 2012. Mother said she was not drug testing because she was still smoking marijuana, which she did not consider a problem, and that she would drug test when "I get sobered up." DCFS recommended that mother continue to receive family reunification services and be granted monitored visitation.

On June 5, 2012, the court found mother's progress towards reunification to have been minimal. It ordered that Joseph remain in foster care and mother continue to receive reunification services.[3]

## III.     12-Month Review

The December 4, 2012 status review report said Joseph continued to thrive in the home of his paternal cousins, who were interested in adopting him. The foster mother reported that mother visited Joseph inconsistently and rarely called to check on his well-being or to speak with him. Mother claimed she had not been visiting Joseph regularly

---

[3]     The June 5, 2012 report said father had been released early from prison in April 2012. As a condition of his parole, father was not permitted to have contact with children under 18 years of age because of a juvenile felony charge in 2004 for lewd or lascivious acts with a child. Father reported that he had been sexually abused when he was four years old and had sexually abused another child at age 12. He was arrested at age 14 for sexual abuse of a child and was sentenced to juvenile hall.

because she lacked transportation, and said she had not returned the phone calls from the child's social worker (CSW) because she had not received the messages. Further, she told the CSW that she had not been drug testing or participating in court-ordered programs because "I don't feel I need to attend." Based on the foregoing, DCFS recommended termination of mother's family reunification services.

DCFS advised the court on December 19, 2012, that mother had not appeared for drug tests on November 28 or December 6, 2012, and had not enrolled in any court-ordered treatment.

On December 19, 2012, the court found that mother was not in compliance with her case plan and that returning Joseph to her care would create a substantial risk of detriment to his physical and emotional well being. It therefore terminated mother's family reunification services.

## IV. 18-Month Review

The April 19, 2013 status review report said mother had not been in contact with DCFS since her services were terminated. She continued to visit Joseph inconsistently, often showing up late or canceling visits at the last minute.

On June 26, 2013, the court terminated father's family reunification services and set a section 366.26 hearing.[4]

## V. Mother's Section 388 Petition

Mother filed a section 388 petition on October 1, 2013, seeking reinstatement of her family reunification services. In support, mother submitted: (1) a July 17, 2013 letter stating that mother began participating in an outpatient drug program on June 20, 2013, (2) a letter from mother's substance abuse counselor noting "a complete change with [mother's] attitude and with her character; she continues to work towards making changes with her communication and has the desire[] to create a healthier lifestyle and a

---

[4]     Because of the conditions of his parole, father would not have been able to reunify with Joseph until his parole expired in 2015.

better life not only for herself but for her children," (3) a visitation log prepared by mother showing visitation with Joseph between June and September 2013, (4) certificates showing mother's enrollment in and completion of a 21-hour parenting class, and (5) letters from mother and maternal grandmother. Mother's letter to the court said, in part: "[I]f given a second chance to reunite with my son I will be an exceptional mother to him. I will continue to attend the programs and classes that are required of me to pro[ve] myself worthy of him and have a positive and great influence on him. [¶] I am currently[] working and making every effort to provide him with a healthy and decent environment. I am currently allowed weekly monitored visits on Sundays a total of 3 hours where I am consistent. In the event that it's difficult for me to make it on Sunday, I reschedule with the caregiver and I am allowed to visit on Thursdays at 6:00 pm for a period of 2 hours."

DCFS filed section 388 and section 366.26 reports on October 23, 2013. DCFS recommended that mother's petition be denied and that Joseph be released for adoption, noting the following:

*Mother's drug use.* Under the terms of mother's outpatient treatment program, mother was required to attend groups three times per week, drug test once a month, attend NA meetings twice a week, and attend drug counseling as needed. According to mother's substance abuse counselor, mother had regularly attended the program and tested negative for drugs in August and September 2013. However, mother was not in full compliance with the program: She tested positive for marijuana on June 20 and missed a drug test on July 3. Further, although mother began attending NA meetings in mid-July, her attendance had been inconsistent. Finally, mother disclosed in October 2013 that she was pregnant and expected to give birth in November 2013. DCFS said that "[b]ased on the DCFS's assessment of the mother's pregnancy timeline, the mother had prenatally exposed her unborn child to drugs, as evident by her positive test for marijuana on 6/20/13 and her missed drug test on 7/3/13. [¶] It is clearly evident that [mother] has not fully resolved her long history of substance abuse . . . , which was originally brought to the attention of the Court 10/18/2011."

6

*Failure to participate in individual therapy.* As of October 8, 2013, mother still had not enrolled in individual therapy. When the CSW asked mother about it, mother said she did not know when she would enroll because "I have a lot going on." Further, she indicated that she intended to enroll in therapy just before the next hearing "so I can have something to show the court."

*Inconsistent visitation.* Joseph's foster mother indicated that mother's visits with Joseph had been inconsistent until September 2013, when mother started visiting regularly. However, even after mother began visiting regularly, she never spent four hours per week with Joseph as she was entitled to do. Instead, she generally ended visits after two or three hours.

*Unstable housing.* Mother's housing continued to be unstable. As of October 2013, mother was living with maternal grandmother; although she said she hoped to move out, she did not know when she would do so as she was currently unemployed.

*Attachment to caregivers.* DCFS indicated that Joseph was thriving in the home of his caregivers, with whom he had been living for more than two years and who wished to adopt him. He had a secure attachment to his caregivers and sought "his caregiver's attention for comfort, guidance and support." During visits, he sought help from his caregivers, not mother. He referred to his caregivers as "mommy" and "daddy." DCFS said Joseph "does not have a parent-child bond with his birth parents" and "perceives [his caregivers] as his parental figures."

The court denied mother's section 388 petition on October 23, 2013. The court explained: "[T]here has not been a change of circumstances in this case. The circumstances may be changing, but they have not changed. Also the court does have to look out for the interest of the child in terms of stability, and the court feels that the proposed change would not be in the best interest of the child at this point given the history [of] this case. So the mother's 388 is going to be denied."

Mother timely appealed.

**DISCUSSION**

Section 388 allows a parent to petition the juvenile court to change, modify, or set aside any previous order. (§ 388, subd. (a).) "Section 388 provides the 'escape mechanism' that . . . must be built into the process to allow the court to consider new information." (*In re Marilyn H*. (1993) 5 Cal.4th 295, 309; see also *In re Zacharia D*. (1993) 6 Cal.4th 435, 447; *In re Stephanie M*. (1994) 7 Cal.4th 295, 317.) The petitioner has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances, and (2) that the proposed modification would be in the best interests of the child. (§ 388; *Nahid H. v. Superior Court* (1997) 53 Cal.App.4th 1051, 1068.) That is, "[i]t is not enough for [the petitioner] to show *just* a genuine change of circumstances under the statute. The [petitioner] must show that the undoing of the prior order would be in the best interests of the child. [Citation.]" (*In re Kimberly F*. (1997) 56 Cal.App.4th 519, 529.) Furthermore, "the petitioner must show *changed*, not changing, circumstances. (*In re Casey D*. [(1999) 70 Cal.App.4th 38,] 47.) The change of circumstances or new evidence 'must be of such significant nature that it requires a setting aside or modification of the challenged prior order.' (*Ansley v. Superior Court* (1986) 185 Cal.App.3d 477, 485.)" (*In re Mickel O*. (2011) 197 Cal.App.4th 586, 615.)

"In considering whether the petitioner has made the requisite showing, the juvenile court may consider the entire factual and procedural history of the case. (*In re Justice P*. (2004) 123 Cal.App.4th 181, 188-189.) The court may consider factors such as the seriousness of the reason leading to the child's removal, the reason the problem was not resolved, the passage of time since the child's removal, the relative strength of the bonds with the child, the nature of the change of circumstance, and the reason the change was not made sooner. (*In re Aaliyah R*. (2006) 136 Cal.App.4th 437, 446-447.) In assessing the best interests of the child, 'a primary consideration . . . is the goal of assuring stability and continuity.' (*In re Stephanie M*., *supra*, 7 Cal.4th at p. 317.)" (*In re Mickel O*., *supra*, 197 Cal.App.4th at p. 616.)

8

We review the juvenile court's denial of a section 388 petition for an abuse of discretion. "'"The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." [Citation.]' (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319.)" (*In re Mickel O.*, *supra*, 197 Cal.App.4th at p. 616.)[5]

### A.    *Mother Was Not Denied a Hearing*

Mother contends that the juvenile court abused its discretion by denying a hearing on her section 388 petition. We do not agree that she was denied a hearing. At the start of the October 23, 2013 hearing, the court asked mother's counsel whether she wished to present evidence on the petition. Counsel responded as follows:

"[Mother's counsel]: Yes, Your Honor. Mother's testimony.

"The Court: What is the offer of proof and the purpose of the testimony?

"[Mother's counsel]: I am going to show that there is a change of circumstances and it is in the best interest of the child to offer my client more reunification.

"The Court: Okay. You submitted documentary evidence in support of your section 388?

"[Mother's counsel]: Correct.

"The Court: What additionally would be proven by the testimony?

"[Mother's counsel]: I wanted to clarify just more information for the court if the 388 — if the court feels the 388 is sufficient to render a ruling, I don't need to call mother. However, I feel that the court would be persuaded by mother's testimony.

---

[5]    Father contends that he has standing to appeal the denial of mother's section 388 petition because his parental rights cannot be terminated so long as mother is still receiving reunification services. Because mother plainly has standing to challenge the denial of her own section 388 petition, and because father merely joins mother's arguments, resolving the question of father's standing has no bearing on the resolution of this appeal. We therefore assume for purposes of this appeal that father does have standing.

9

"The Court: As to what issue?

"[Mother's counsel]: As to a change of circumstances and that she does in fact have a bond with her child, and it's in the best interest of the child to continue [family reunification] for mother.

"The Court: Anyone wish to be heard?

(All counsel submit.)

"The Court: I really don't see the necessity for the testimony in this case. I think the court has sufficient evidence to give a ruling as to the 388 based upon the information that has been provided both by mother and by the department in this case."

This exchange reveals that mother was given the opportunity to present evidence but declined to do so. The court specifically asked mother's counsel whether she wished to present evidence; mother's counsel responded that "if the court feels the 388 is sufficient to render a ruling, *I don't need to call mother*." (Italics added.) On this record, the court's failure to hear testimony was not an abuse of discretion.

>
> B.       *Even If Mother Had Been Denied a Hearing, There Would Be No Abuse of Discretion Because She Did Not Make a Prima Facie Showing That She Was Entitled to Section 388 Relief*

Even if counsel had not declined the opportunity to present testimony, we still would find no abuse of discretion. To be entitled to a hearing on a section 388 petition, the parent must make a prima facie showing that he or she is entitled to relief. (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 257-258.) "'"[I]f the petition presents any evidence that a hearing would promote the best interests of the child, the court will order the hearing." [Citation.]' (*In re Jasmon O.* [(1994) 8 Cal.4th 398,] 415.) 'However, if the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition. [Citations.] The prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition.' (*In re Zachary G.* (1999)

10

77 Cal.App.4th 799, 806.) In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case. (*In re Justice P*. (2004) 123 Cal.App.4th 181, 188-189.)" (*In re Jackson W*., *supra*, at pp. 257-258.)

Mother contends that because she presented evidence that she was participating in drug rehabilitation, had completed a parenting class, and was attending counseling, she made a prima facie showing that she was entitled to relief. We do not agree. By October 2013, mother had been using drugs regularly for at least two and a half years. Between October 2011 and May 2013, mother refused to participate in drug rehabilitation or testing, telling her CSW that she did not believe her drug use was a problem. Although it appears that mother belatedly sought drug counseling after her family reunification services were discontinued, there is no suggestion that mother has conquered her drug problem. Even while enrolled in drug rehabilitation (and while pregnant with her second child), mother continued to use drugs, testing positive for marijuana in June 2013 and missing a drug test in July 2013. As of the date of the section 388 hearing, therefore, mother had only two clean drug tests, in August and September 2013. Further, mother did not begin attending NA meetings until mid-July 2013, and even then her attendance was inconsistent. In light of mother's long history of drug use, two clean drug tests and partial compliance with a drug rehabilitation program hardly demonstrate changed circumstances.

Further, mother's visitation with Joseph was erratic throughout the period of DCFS supervision. Between October 2011 and August 2013, mother frequently missed scheduled visits, often without any notice. Joseph's foster mother reported that mother started to be consistent with her weekly visits only in September 2013, about a month before the hearing, and even then mother did not take full advantage of the visitation offered her. In view of mother's long history of erratic visitation, a single month of consistent visits does not demonstrate changed circumstances.

Finally, and most important, there was no evidence that reinstating mother's family reunification services was in Joseph's best interests. By October 2013,

11

five-year-old Joseph had lived with mother for less than two years, and had lived with his foster parents for more than three years. He had a secure attachment to his foster parents, referred to them as "mommy" and "daddy," and looked to them for comfort and support. In contrast, DCFS reported that while Joseph enjoyed visits with mother, he did not have a parent-child bond with her. Moreover, Joseph's foster parents wanted to adopt him, offering him the permanency and stability mother had not been able to give him. Thus, the juvenile court did not abuse its discretion in concluding that reinstating mother's family reunification services was not in Joseph's best interests.

Mother contends that she was merely a "recreational" user of marijuana, and thus her four successful months in rehabilitation was enough to show a prima facie change of circumstances. We do not agree. There is no evidence that mother's use was "recreational"; indeed, because mother refused to drug test during most of the period of DCFS supervision, we have no real indication of the extent of mother's drug use. Further, although mother had been participating in drug rehabilitation for four months, she had tested drug free only for two months. Therefore, while mother appears to be making good progress in drug rehabilitation—for which we commend her—her progress is not sufficient to demonstrate changed circumstances.

Mother also contends that Joseph would benefit from increased interaction with her because her visits were "nurturing and appropriate." However, "[a]fter the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' (*In re Marilyn H.*, *supra*, 5 Cal.4th 295, 309), and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child." (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) Thus, evidence that mother was nurturing and appropriate with Joseph is not enough to show changed circumstances. Instead, the juvenile court was required to weigh the benefit to Joseph of continued visits with mother, on the one hand, against the benefits of a stable, permanent adoptive placement with caregivers with whom Joseph had been living for several years and had developed a parental bond, on the other. The juvenile

12

court did not abuse its discretion in concluding that the benefit to Joseph of a stable, permanent home outweighed the benefits of continuing to visit mother.

## DISPOSITION

The order denying mother's section 388 petition is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

EDMON, J.[*]

We concur:

EPSTEIN, P. J.

WILLHITE, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.