Filed 11/19/20  In re W.J. CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re W.J. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CLAUDIA V.,<br><br>Defendant and Appellant. | F081093<br><br>(Super. Ct. Nos. 19CEJ300299-1, 19CEJ300299-2, 19CEJ300299-3 & 19CEJ300299-4)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from an order of the Superior Court of Fresno County.  William Terrence, Judge.

Nicholas J. Mazanec, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel C. Cederborg, County Counsel, and Lisa R. Flores, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]      Before Levy, Acting P.J., Peña, J. and De Santos, J.

Claudia V. (mother) appeals an order denying her petition to either set aside previously sustained sexual abuse allegations of the dependency petition and dismiss the dependency or return three of her four children to her on family maintenance. (Welf. & Inst. Code, § 388.)[1] She contends the juvenile court abused its discretion in denying the petition, as she presented new evidence that undercut the foundation for jurisdiction, the court failed to consider all the evidence, and the request was in the children's best interest. She also contends her trial counsel was ineffective because she failed to enter certain discovery into evidence. Finding no merit to mother's contentions, we affirm the order.

### FACTUAL AND PROCEDURAL BACKGROUND

Mother has four children—two daughters, now 16-year-old W.J. and 15-year-old D.J., and two sons, now 14-year-old J.J. and five-year-old G.J. The three oldest children share the same father, Francisco M. (father), while G.J.'s father is Alfredo M. (stepfather).[2] Mother was married to father when the three oldest children were born. Mother and father divorced in 2015 and mother married stepfather the following year.

The family came to the attention of the Fresno County Department of Social Services (Department) in August 2019, when the Department received a referral alleging then 15-year-old W.J. had stated her stepfather touched her inappropriately and raped her when she was in eighth grade, and when she told mother, mother did not believe her.

The social worker interviewed W.J. on August 20, 2019. W.J. disclosed an uncle sexually molested her from when she was eight years old until she was in the eighth grade, and while mother was aware of this and confronted the uncle, they never reported him to law enforcement. W.J. also said her stepfather raped her in the summer of 2018,

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Neither father appeared during the dependency proceedings and their whereabouts were unknown. Both father and stepfather were denied reunification services. They are not parties to this appeal.

2.

when mother was at work. W.J. told mother about the rape in July 2019. Mother kicked stepfather out of the home, but he returned to live there so he could care for G.J. Mother told W.J. she needed to "gather evidence" to prove stepfather raped W.J. and then she would report it to law enforcement. W.J. told the social worker mother "watches us all the time now."

The social worker contacted the police, who interviewed W.J. W.J. told police stepfather "groped" her when she was 13 or 14 years old. He would slip his hand inside her shirt, touch her buttocks, and tell her things like "you look hot" or "you have a fine ass." W.J. also said "[h]e slipped his hands in my pants." W.J. said the rape occurred during spring break in 2018. It was early morning and her siblings were asleep. W.J.'s cellphone had been taken away from her because she was in trouble. Stepfather called her into his bedroom and ordered her to take off her clothes in order to get her cellphone back. Stepfather then "pushed her on the bed" and forcibly raped her. Thereafter, stepfather continued to inappropriately touch her buttocks. W.J. said she left a note on mother's bed, which stated stepfather was groping her. After mother found the note, she confronted stepfather, who began to cry and admitted to inappropriately touching W.J. Mother told stepfather to stop and he did.

W.J. told the police she was diagnosed with severe depression and had attempted suicide. She told mother about the rape in July 2019, after mother found marijuana in her room. Mother confronted stepfather, but he denied raping W.J. Mother told her not to be alone with stepfather and to stay away from the house until mother came home from work. W.J. was taken to be interviewed by a sexual abuse detective.

The police placed a protective hold on the children. The social worker met with the police detective who interviewed W.J. and mother. W.J. told the detective stepfather raped her during spring break in 2018 and he began groping her breasts, buttocks and vagina on numerous occasions since she was 13 years old. W.J. said she told mother about being fondled a year ago and about the rape after it happened, but mother did not

do anything about it. Mother gave inconsistent statements regarding her knowledge of the alleged sexual abuse. She would say she was not aware of the abuse and did not know the details, but later stated she needed to do "her own investigation." Mother also stated she was aware of the sexual abuse and confronted stepfather about telling W.J. she had a "big butt." Mother did not know stepfather's current whereabouts or his cellphone number. She kicked stepfather out of the home two weeks earlier, but the children reported he spent the night there the previous night and stepfather's clothing was still in the home. The detective had a cellphone number for stepfather, but no one was answering the phone. W.J. was taking anti-depressants; the detective gave the social worker her psychotropic medications.

The social worker spoke with the detective the next day. The detective stated the allegations were "not cut and dry" and there were "a lot of things going on with [W.J.]" The detective said mother did not believe W.J.'s allegations and was not cooperative with the investigation. Mother was "evasive" and "not protective," and said W.J. was a "liar" and a "runaway." Mother came across as defensive and "pled the fifth" when asked about the allegations. Mother did not report the uncle's molestation of W.J. to law enforcement because the same uncle molested mother. The detective noted mother had a habit of not reporting abuse; when W.J. ran away with an 18-year-old boyfriend who had inappropriately touched her, W.J. asked mother not to make a report.

Two social workers interviewed D.J. and J.J., both of whom denied they were sexually abused. J.J. said stepfather took care of G.J. inside the home in the mornings, but then he would leave. D.J. said stepfather did not live in the home and she felt "safe" with him. D.J. recalled one time when mother asked her if stepfather inappropriately touched her private parts; she told mother "no." D.J. said her sister "smokes weed to numb the pain" and drank alcohol.

The social workers spoke with mother, who said law enforcement "caught her by surprise" and she was aware she was not cooperative the day before. Mother said she

believed W.J.'s allegation that stepfather sexually abused her.  Mother said W.J. told her around August 1, 2019, that stepfather raped her.  When mother confronted W.J. about finding a "vape pen" and asked why she smoked it, W.J. began to cry and said it was "to numb the pain, because [stepfather] raped me."

Mother said she kicked stepfather out of the home and he no longer lived there.  When asked why stepfather's belongings were still in the home, mother said she did not know.  She had packed his things in her car and was going to take them somewhere.  Mother did not report W.J.'s sexual abuse to law enforcement because she wanted to "gather evidence, such as pictures, or texts proving he did do it," but "[i]t came down to nothing," as she found no evidence it happened.  Mother denied W.J. told her the year before that stepfather was inappropriately touching her, and she said W.J. only told her stepfather was calling her names.  Stepfather admitted he told W.J. she "had a big butt" and mother told him not to speak to W.J. that way.

Mother first said that maternal grandmother provided childcare for G.J. at her aunt's home while mother was at work.  When the social worker asked why the children said stepfather was in the home caring for G.J. the day before, mother changed her story and said he came to the home in the mornings to care for G.J. while she was at work, as a parent needed to be present when G.J. had in-home learning.  Mother said she did not report that the uncle abused W.J. because she was not aware of it.  Mother said W.J. had a 17-year-old boyfriend who W.J. claimed sexually abused her, but W.J. did not want it to be reported.

At an August 22, 2019 team decision making meeting, the Department decided to keep the children in out-of-home care, as voluntary family maintenance services were not appropriate since mother was not fully cooperative with the investigation and did not believe W.J.'s allegations.  During the meeting, it was disclosed that W.J. had a history of cutting, which W.J. said was due to bullying and sexual abuse.

*The Dependency Petition*

A dependency petition was filed, followed by a first amended petition which alleged the children fell within the provisions of section 300, subdivisions (b)(1) (failure to protect), (d) (sexual abuse), and (g) (no provision for support), and W.J. also fell within the provisions of section 300, subdivision (c) (serious emotional damage). Specifically, the first amended petition alleged: (1) mother failed to protect W.J., and the other children were at risk of suffering serious physical harm or neglect, because, despite W.J. telling her that stepfather sexually abused her, mother failed to protect W.J. from further abuse, or report the abuse to law enforcement and the Department (§ 300, subd. (b)(1)); (2) W.J. was suffering severe emotional damage, as shown by her depression and anxiety, which resulted from mother failing to protect her from sexual abuse by stepfather (§ 300, subd. (c)); (3) W.J. was sexually abused by stepfather, which mother failed to protect her from, and the other children were at substantial risk of being sexually abused by stepfather (§ 300, subd. (d)); and (4) the children were left without provision for their support as the whereabouts of their father and stepfather were unknown (§ 300, subd. (g)).

On August 23, 2019, the children were detained.

*The Jurisdiction and Disposition Hearing*

At the request of mother's attorney, a contested jurisdiction and disposition hearing was set for January 30, 2020, with a settlement conference to be held on November 7, 2019.

The Department prepared jurisdiction and disposition reports for the hearing. The three younger children were placed together with their maternal uncle and his partner, while W.J. was in a group home. D.J. and J.J. told the social worker they felt safe at home with mother and wanted to return home to her. W.J. was hospitalized on September 5, 2019, because she was having a psychotic episode and needed to be restrained. She was transferred to a behavioral health hospital on September 17, 2019,

6.

and placed on a section 5250[3] hold two days later. She was prescribed Depakote, Seroquel, and Zyprexa.

The children had mental health assessments. W.J., who was diagnosed with severe depression, anxiety, and bipolar disorder, was recommended for ongoing treatment, including individual and family treatment and clinical case management. W.J. was hospitalized for her many emotional and mental health issues from September 5 to October 1, 2019. W.J. was taken to Valley Children's Hospital on October 21, 2019, on a section 5150 hold, and was transported to a psychiatric health facility two days later, where she was placed on a section 5250 hold. As of November 4, 2019, W.J. had made improvements but needed to be monitored for a few more days. Ongoing individual therapy and clinical case management was recommended for the other children.

Mother, who had court-ordered supervised visits with the children, had been visiting the three younger children regularly and appropriately. Visits with W.J., however, were sporadic due to W.J.'s hospitalizations. During an October 15, 2019 supervised visit with mother, W.J. stated she did not want to see mother anymore because mother was aware that she was being sexually abused, yet mother did not care or allow her to receive therapy. After the visit, the social worker asked W.J. if she really did not want to see mother. W.J. then stated she was willing to visit mother again.

A family reunification panel was held on October 8, 2019, as mother met the provisions for bypass of family services under section 361.5, subdivision (b)(6), based on the allegations of severe sexual abuse. The social worker noted that, according to the detective, W.J. appeared to be consistent with her reports of sexual abuse and there was an ongoing criminal investigation into her allegations, but stepfather's whereabouts were

---

**3**      Under section 5250, an individual who has been detained for 72 hours under sections 5150, 5200 or 5225, and has received an evaluation, may be certified to receive intensive treatment related to a mental health disorder or impairment by chronic alcoholism for a maximum of 14 days.

unknown. Mother denied that W.J. told her about any sexual abuse before the current allegations were reported and said she was not aware of anything until W.J. disclosed the rape on August 1, 2019. Thereafter, she wanted to do her own investigation because she was unsure if W.J. was making up the allegations to avoid getting into trouble for being caught with a vape pen. Mother stated she believed W.J. and wanted stepfather to be criminally prosecuted.

Mother was asked about W.J.'s past disclosures of sexual abuse by other family members. Mother stated there were two uncles who molested or groped W.J. when she was a child; one was arrested and prosecuted after another child came forward alleging sexual abuse, while the other went to Mexico to avoid prosecution. Mother said she always believed W.J. about the sexual abuse and rape allegations, but she was not sure if W.J. was being honest about who raped her, as W.J. "never liked" stepfather, though she did not act differently around him. Whenever mother caught W.J. doing something that could get her in trouble, W.J. would disclose something to avoid getting into trouble. W.J. began having mental health issues when she was in eighth grade. W.J. sent nude photos of herself to boys in school, which led to her being bullied. W.J. began having suicidal ideations, and one girl, who bullied W.J., beat her up on one occasion. Mother said she obtained a restraining order against the girl and the school expelled her.

Mother said she would remain single and never have anyone else live in her home again if it meant her children were safe. She also said she would be more vigilant in the future regarding who babysat her children and where they were watched, and she would "start reporting everything my kids tell me right away." Mother experienced domestic violence in her relationship with father, but her relationship with stepfather had been good until the family's involvement with the Department. Mother told the Department she also was the victim of sexual abuse when she was younger. The Department noted it appeared to be a cycle for the family not to properly address sexual abuse allegations. Mother was doing services on her own; she was participating in a parenting program and

mental health treatment. She was willing to participate in any services ordered and believed she could benefit from parenting classes, mental health and family therapy.

The Department believed it was in the children's best interest to recommend services for mother. While the prognosis for successful reunification was guarded due to the severity of the allegations and the family's extensive cycle of sexual abuse issues, it appeared likely. Although the Department was unable to fully assess W.J.'s relationship with mother due to W.J.'s mental health issues, the three younger children seemed to have a strong parent/child relationship with mother and wanted to reunify with her. The Department was concerned about mother's ability to protect the children from further harm, but believed reunification services would enable her to ameliorate the reasons for the children's removal, noting there appeared to be a cycle of sexual abuse within mother's family which had not been addressed, and providing services to mother would help treat her own trauma and address safe parenting issues. Mother appeared willing to participate in the necessary services to be able to provide for the children's need for safety. Thus, the Department recommended the children remain placed in out-of-home care and mother be ordered to participate in reunification services.

At the November 7, 2019 settlement conference, the Department submitted on the reports and recommendations. The children's attorney stated that while there was "a valid (b)(6)" for mother, the children had a warm relationship with mother, and he confirmed they wanted to reunify with her. Accordingly, he submitted on the Department's recommendation. Mother's attorney stated mother was submitting on jurisdiction, but mother wanted the court to know she had been taking W.J. to therapy before the Department's involvement. In addition, mother, who had not been offered services at detention, pursued them on her own; she was participating in therapy and had attended 10 sessions of a parenting class.

After finding mother knowingly, intelligently, and voluntarily waived her right to a contested hearing on the issues of jurisdiction and disposition, the juvenile court found

the petition's allegations true, removed the children from mother's custody, and ordered reunification services for mother, which included parenting classes and mental health and domestic violence evaluations and any recommended treatment. A postdisposition mediation hearing was set for January 30, 2020.

*The Section 388 Petition and Hearing*

Mother filed a section 388 petition on January 3, 2020, in which she asked the juvenile court to revisit the jurisdictional findings. As changed circumstances or new evidence, mother asserted W.J. recanted her prior statements during a November 19, 2019 supervised visit as reflected in the delivered service logs that were provided to the parties, which mother's attorney would provide to the court, if needed. Mother asked the juvenile court to either: (1) find the petition's allegations to not be true; (2) amend the allegations to conform to the new evidence, return the children to her custody, and dismiss dependency; or (3) place the children with her on family maintenance. Mother asserted these changes would be in the children's best interest because they had a very strong bond with her and would have more security and stability if placed with her.

A postdisposition mediation was held on January 30, 2020. W.J. was discharged from the psychiatric health facility on November 4 and placed in a short-term therapeutic residential placement, where she was receiving on-site mental health services. The other children remain placed together in a relative home. Mother had completed a mental health assessment, which recommended she participate in individual therapy. She also completed a domestic violence inventory, which recommended she complete a 52-week child abuse class. Mother completed a parenting program in December 2019. The results of the mediation were for the juvenile court to continue with a case plan goal of family reunification, with mother continuing to participate in her court-ordered services.

At the January 30, 2020 hearing, county counsel asked the juvenile court to adopt the results of the mediation. As for the section 388 petition, the Department had filed a written response, which recommended denial of the petition and continuation of

10.

reunification services. The children's attorney submitted on the mediation and whether the section 388 petition should be set for a contested hearing. Mother's attorney did not think the petition needed to be set for a trial, as all the information she intended to present was in the Department's response, which indicated W.J. recanted all her statements. Mother's attorney was willing to simply argue why the petition should be granted. The children's attorney then declared a conflict between W.J. and the other children, as he could not represent all of them when arguing the section 388 petition. The juvenile court appointed a new attorney for the three younger children and set a continued hearing on the section 388 petition for February 20, 2020.

In the Department's response to the section 388 petition, the social worker provided further details concerning mother's statements during the family reunification panel meeting. Mother reported that W.J. was molested by one uncle when she was five or six years old, and she disclosed the abuse when she was eight years old after another child came forward accusing that uncle of sexual abuse. That uncle was convicted, but mother was not aware of the sentence. W.J. was 12 years old when a cousin groped her and W.J. disclosed that abuse when she was 13 years old. Mother confronted the cousin, but she believes he went to Mexico; she did not report the abuse to law enforcement. During the meeting, the social worker stated there were allegations in the child welfare history that mother was molested by the same uncle who molested W.J., as well as by a second uncle. Mother's brother was required to register as a Penal Code section 290 sex offender due to a sexual relationship with an underage girl and sentenced to serve time in a correctional institution.

During a supervised visit following the November 7, 2019 court hearing, W.J. kept asking to go home with maternal aunt and uncle, but also made comments about wanting to stay in her current placement and wanting to return to mother. At a supervised visit five days later, W.J. said she wanted to live with maternal aunt, as she believed her anxiety and depression would decrease, and she believed she was ready to live with

maternal aunt. W.J. started crying, saying she would go insane in the group home and if she could live with maternal aunt, she was willing to go to school and drug test. W.J. told mother she needed to be with family as soon as possible and wanted to go home.

At the beginning of a supervised visit on November 19, 2019, W.J. immediately stated, "[Stepfather]. I started it," and she lied to the detective about the sexual abuse. She admitted being a "porn addict," and said she watched a video about a stepfather and daughter, so she went to stepfather and "dry humped him," but he pushed her away. W.J. started crying, saying she lied about having intercourse with stepfather because she did not like that he made her clean her room. W.J. said she was "messed up in the head," was sorry she lied to the police, and she "thought it would take him away but it took me away." W.J. said she needed to talk to the investigator and then turned to mother and apologized for lying. W.J. repeatedly said she wanted to be with mother. She wanted to get stepfather out of the house and have him go to jail. She did not think "it would go this far," but she was "saying the truth now," and she blamed the sexual abuse she went through as a child.

Mother attempted several times to redirect the conversation, but W.J. would bring the conversation back to going home. W.J. said she did not want to leave mother and wanted to stay with her forever. W.J. did not think she "would be taken away this long." W.J. said she was having migraines because she was stressed and needed to go home. W.J. asserted she was being responsible, taking her medication, helping to clean, and washing her clothes. Mother told her not to stress and to enjoy her life, but W.J. said the only way she could do that was to be home with mother. After W.J. left the visit, mother stated she did not expect W.J. to say the things she did.

On January 2, 2020, it was reported that G.J. was making inappropriate gestures. In September and November 2019, G.J. exhibited "humping" behavior, where he humped things such as tables and chairs. The behavior lessened but returned after the December 2019 winter holiday. Concerned about the behavior, the care provider contacted mother,

who said she was aware of the behavior and explained W.J. used to play the "jumping game" with him, where W.J. took G.J. to her room and let him jump on her stomach, which looked like humping.  Mother also said W.J. took G.J. to her room to watch porn.  Mother told the care provider she caught W.J. and G.J. several times.  Mother caught W.J. jumping naked with J.J. two years ago.  The care provider stated G.J.'s behavior increased after visits with W.J.  The care provider asked D.J. if she knew about the "jumping game" and if she had seen anything in the past, but D.J. stated she was not aware and then cried.

Two social workers interviewed the three younger children on January 13, 2020.  J.J. was aware W.J. used drugs because he heard mother talking to W.J. about it.  He saw G.J. rubbing against a couch in the past.  J.J. denied being touched inappropriately by anyone and said visits with mother were going well.  G.J. was not willing to speak with the social workers.  D.J. was aware of G.J.'s humping and said it happened when they were in mother's care.  D.J. denied being touched inappropriately by anyone but also stated that if it should happen, she would not tell an adult.  D.J. wanted her and her siblings to return home to mother, although she wanted to know if it was possible for W.J. to visit but not live there.

The next day, the social workers contacted mother, who denied being aware of the "jumping game" and said G.J. learned the humping behavior from another little boy in the neighborhood.  Stepfather was G.J.'s primary caregiver, as mother was not home most of the time because she worked many hours and stepfather did not work.  Stepfather told her he saw W.J. put G.J. on her stomach and he jumped, but that only happened once.  After that, stepfather did not allow G.J. to be with W.J.  Mother said she used to catch W.J. watching porn.  Mother denied catching W.J. naked with J.J. and said the care provider misinterpreted their conversation.

The Department believed there continued to be substantial detriment to the children if they were returned home, as it was concerned mother would allow stepfather

13.

to have access to the children and would neglect their needs. The Department asserted mother lacked the capacity and ability to provide for the children's safety, and appeared to normalize or minimize the seriousness of sexual abuse.

It appeared to the Department that W.J. was using manipulation to return home. On October 30, 2019, W.J. told mother she was raped at the psychiatric health facility, but she would not provide information about it until mother came and took her home. During supervised visits, W.J. stated she should go home because she had migraines due to stress, and her anxiety and depression would decrease. At first, W.J. stated maternal aunt wanted her to live at maternal aunt's home. Then, maternal aunt no longer wanted W.J. to live with her and maternal grandmother wanted her. Recently, W.J. contacted maternal aunt falsely stating the social worker did not allow sibling visits to occur at maternal aunt's home.

The Department wanted to see mother demonstrate the ability to protect her children from sexual abuse and be responsive to their statements and behaviors, noting the sexual abuse appeared to be multigenerational. Accordingly, the Department recommended the continuation of reunification services for mother and the children remain in out-of-home care.

At the February 20, 2020 hearing, the attorneys for the Department and the children asked the juvenile court to deny the petition. Mother's attorney argued W.J.'s recantation of the allegations that began the case was grounds to dismiss jurisdiction, adding that the discovery she received the day before indicated even the therapist was stating it would be better for W.J. to have more time with mother. Alternatively, mother's counsel asked the juvenile court to retain jurisdiction, but place the three younger children with mother.

The juvenile court denied the section 388 petition on all grounds. The juvenile court stated it read the petition and was "certainly concerned about some of the statements that were made and referenced, as far as discovery is concerned," but it

14.

believed "there's more going on here than just a simple recantation" as described in the Department's response. The juvenile court explained: "W[.J.] essentially has made several statements, and many of those statements seem motivated by a desire to return home, not so much that allegations themselves aren't true. The Court does not believe it's in the best interest of any of the minors to grant the [petition]. The Court does realize that the minor W[.J.] has made statements contrary to her earlier statements; however, it is not enough that this Court believes it's in the best interest of the children to change the course of the case at this point…. This Court does not believe it's in the best interest of the minors to place any of the minors back … into family maintenance with mother, … nor does this Court believe[] it's appropriate to reverse the prior findings in the case, and find[] [the] petition to be not true." In its written order, the juvenile court stated the petition was denied because the requested relief was not in the children's best interest and the evidence presented did not establish changed circumstances.

### DISCUSSION

#### *The Section 388 Petition*

A parent has the right to petition the court to change, modify, or set aside a prior order on the grounds of change of circumstance or new evidence. (§ 388, subd. (a)(1).) In bringing the petition, the parent has the burden to prove by a preponderance of the evidence that new evidence or changed circumstances exist and the proposed modification would be in the child's best interest. (*Nahid H. v. Superior Court* (1997) 53 Cal.App.4th 1051, 1068; Cal. Rules of Court, rule 5.570(a), (e).)

Whether the juvenile court *should* modify a previously made order rests within its discretion and its determination may not be disturbed unless there has been a clear abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. (*Id.* at pp. 318–319.) All conflicts in the record must be resolved in favor of the juvenile court's decision and all legitimate inferences indulged in to uphold that decision. (*In re Jason L.*

15.

(1990) 222 Cal.App.3d 1206, 1214.)  When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.  (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 319.)

It has been held that a section 388 petition is the appropriate vehicle by which to bring a recantation of sexual abuse charges to the juvenile court's attention.  (*In re Brandon C.* (1993) 19 Cal.App.4th 1168, 1170–1171.)  The court in *Brandon C.*, however, cautioned:  "[W]e do not mean to imply that recantation by a victim or witness in a sexual abuse case will always constitute 'new evidence' for purposes of section 388, or that an evidentiary hearing will be warranted in every such case.  Nor do we mean to imply that a mere showing of 'recantation' will justify modifying or setting aside the juvenile court's jurisdictional and dispositional orders."  (*In re Brandon C.*, *supra*, at p. 1172.)  In each case, the juvenile court must determine whether the petitioner has presented a change of circumstance or new evidence and made a prima facie showing that " 'the best interests of the child may be promoted by the proposed change of order.' " (*Ibid.*)

Here, the juvenile court considered mother's petition for modification and the Department's response, and concluded W.J.'s statements made at the November 19, 2019 visit were insufficient to warrant a change in the outcome of the case and mother failed to show reopening jurisdiction would be in the children's best interests.  Both conclusions withstand appellate scrutiny.

Mother asserts she presented new evidence in the form of W.J.'s recantation of all allegations against stepfather, thereby undermining the foundation for jurisdiction. Certainly W.J.'s statements at the November 2019 visit cast doubt on her original accusations, as well as her credibility.  While mother claims the recantation proves the sexual abuse did not occur, it is not clear which of W.J.'s two accounts is true.  As the juvenile court found, W.J. could very well have recanted because she wanted to return home.  Considering the recantation and W.J.'s original accusations, along with hers and

16.

mother's statements to the social workers and police, the juvenile court reasonably could find, as it did, that this was more than "a simple recantation."

Moreover, jurisdiction was based on mother's failure to protect W.J. after she initially reported the sexual abuse by allowing stepfather to remain in the home and have unsupervised access to W.J., and her failure to report the abuse to law enforcement and the Department. Regardless of whether the abuse occurred, mother failed to take W.J. seriously and take the steps necessary to protect her. Thus, even considering the recantation, there is sufficient evidence to support the sustained allegations of failure to protect and of sexual abuse. Based thereon, the juvenile court reasonably could conclude W.J.'s statements at the November 2019 visit did not warrant reexamination of the allegations of the dependency petition and the "new evidence" would not have changed the outcome of the adjudication.

The juvenile court also reasonably could find it was not in the children's best interest to revisit jurisdiction or return the three younger children to mother on family maintenance. Mother had a long history of minimizing sexual abuse and failing to report it. Despite mother's own sexual abuse by W.J.'s uncle, mother failed to report to law enforcement W.J.'s abuse by that same uncle. She also failed to report when W.J.'s cousin groped her. Finally, she failed to report W.J.'s claim of sexual abuse by stepfather. In addition, G.J. was exhibiting concerning behavior that mother was aware of yet did not address. The Department had ongoing concerns that mother appeared to normalize or minimize the seriousness of sexual abuse, lacked the capacity and ability to protect the children, and she needed to demonstrate her ability to protect the children from sexual abuse. The juvenile court reasonably decided the best interest of the children would not be served by changing the current order of family reunification services for mother, as the evidence supported there was detriment to return the children to her custody, and mother needed services to address the ongoing issues of sexual abuse and sexual behaviors in the home that affected all the children.

Mother urges us to apply factors identified by the appellate court in *In re Kimberly F.* (1997) 56 Cal.App.4th 519 to evaluate the children's best interests. There, the juvenile court denied the mother's section 388 petition, brought on the eve of the section 366.26 permanency planning hearing, seeking return of her children. (*In re Kimberly F.*, at pp. 521–522.) In holding the juvenile court abused its discretion in not granting the motion, the appellate court rejected a juvenile court's use of a simple best interest test— comparing the household and upbringing offered by the parent with that of the caretaker—when analyzing a section 388 petition. (*In re Kimberly F.*, at pp. 522, 526– 530.) The appellate court then determined a number of factors, not meant to be exhaustive, should be considered: (1) the seriousness of the problem leading to dependency and the reason that problem was not overcome; (2) the strength of relative bonds between the dependent children to both the parent and caretakers, and the length of time a child has been in the dependency system in relationship to the parental bond; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been. (*Id.* at pp. 530–532.)

While these factors may be relevant when addressing a section 388 petition brought after reunification efforts have terminated, they are not relevant here, where the section 388 petition is brought soon after disposition, when reunification efforts are continuing. Even so, the problem that led to dependency, namely, mother's failure to protect W.J. from sexual abuse, still existed at the time of the petition and, as we have explained, the juvenile court reasonably could find, despite the children's strong bond to mother, that she needed to participate in services to address her ability to protect her children before they could safely be returned to her.

Finally, mother contends reversal is required because the juvenile court failed to consider all the evidence. Specifically, mother asserts the juvenile court failed to consider evidence from W.J.'s therapist, as reported by mother's trial counsel during

argument on the section 388 petition, that it would be better for W.J. to have more time with mother.

"[I]t is well recognized that the judge must exercise his discretion upon a consideration of evidence, and that the refusal of the trial court to consider *all the evidence* is tantamount to a failure to exercise discretion, and calls for reversal of the ensuing court order or decree." (*In re Marriage of Kern* (1978) 87 Cal.App.3d 402, 411.) But here, there is nothing to suggest the juvenile court refused to consider any evidence. As mother recognizes, the evidence she claims the juvenile court refused to consider, namely, her trial counsel's representation of the therapist's statement, was not evidence. (*EDC Associates, Ltd. v. Gutierrez* (1984) 153 Cal.App.3d 167, 171, fn. 2 ["argument of counsel is not evidence"].) The juvenile court cannot be faulted if it failed to consider something that was not presented as evidence.

The cases mother relies on do not control here. In *Schlumpf v. Superior Court* (1978) 79 Cal.App.3d 892, the appellate court considered which state was the proper jurisdiction to resolve a child custody dispute, holding the trial court erred in finding jurisdiction was proper in California without considering that most of the evidence concerning the children's best interests was located in another state. (*Id.* at p. 901.) In *Nadler v. Superior Court* (1967) 255 Cal.App.2d 523, the trial court awarded custody of the child to the father based solely on the mother's sexual orientation; in ruling, the trial judge stated he was not exercising his discretion and was required to award the father custody as a matter of law. (*Id.* at p. 524.) The appellate court, emphasizing that "it is not until the trial court has considered *all the evidence* that it may exercise its discretion as to how the welfare of the child will best be served," held the trial court erred in failing to exercise its discretion and ruling as a matter of law that the mother was unfit. (*Id.* at p. 525.)

Neither case is applicable here. The juvenile court did not preclude mother's attorney from presenting evidence or refuse to consider any properly presented evidence.

19.

Instead, the juvenile court considered all relevant requisite evidence regarding the merits of the section 388 petition. Based on this record, we conclude the juvenile court did not abuse its discretion in denying the petition.

***Ineffective Assistance of Counsel***

Mother contends her trial counsel was ineffective because she failed to attempt to enter into evidence the delivered services logs provided to the parties the day before the hearing on the section 388 petition. Specifically, she contends there is no satisfactory explanation for the failure of her trial counsel to enter into evidence the log containing a statement of W.J.'s therapist, which her counsel described at the hearing as indicating "it would be better for the eldest minor to have more time with her mother." Mother asserts it is reasonably probable the outcome of the hearing would have been different if the therapist's statement had come into evidence, noting the juvenile court stated it was "certainly concerned about some of the statements that were made and referenced, as far as discovery is concerned."

A parent represented in a dependency proceeding is entitled to competent counsel. (§ 317.5.) A claim of ineffective assistance of counsel may be reviewed on direct appeal if there is no satisfactory explanation for trial counsel's action or inaction. (*In re Dennis H.* (2001) 88 Cal.App.4th 94, 98, fn. 1.) To establish her trial counsel was ineffective, mother must show counsel did not act in a manner expected of reasonably competent attorneys and the error was prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) The same standard applies to retained and appointed counsel. (*Cuyler v. Sullivan* (1980) 446 U.S. 335, 344–345.) Counsel's ineffective assistance is prejudicial if it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of counsel's error. (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

We need not decide whether mother's trial counsel was deficient, as any error was not prejudicial. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1180 [court need not

20.

evaluate whether counsel's performance was deficient before examining the issue of prejudice].)  At best, the therapist's statement shows W.J. needed more time with mother, not that W.J. or the other children should be returned to mother's care or that dependency should be dismissed.  That it might be in W.J.'s best interest to increase visitation does not mean it would be in her best interest to be placed with mother.  The statement also has no bearing on whether it was in the younger children's best interests to be placed with mother on family maintenance, as it apparently pertained only to W.J.  As we have explained, given mother's long history of minimizing sexual abuse and failing to report it, it was in the children's best interest for mother to receive services to address the ongoing issues of sexual abuse and behaviors in the home that affected all the children, before returning the children to her custody.  For these reasons, it is not reasonably probable the juvenile court would have dismissed dependency or returned the younger children to mother's custody had the therapist's statement been admitted into evidence.

## DISPOSITION

The juvenile court's order is affirmed.