Filed 10/18/24  In re K.S. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re K.S., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>K.T.,<br><br>    Defendant and Appellant. | G064072<br><br>(Super. Ct. No. 20DP0036A)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Julie Anne Swain, Judge. Conditionally reversed and remanded for further proceedings.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Debbie Torrez and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the minor child.

\*       \*       \*

The Orange County Social Services Agency (the Agency) filed a child welfare petition on behalf of seven-year-old K.S., alleging he came within the jurisdiction of the juvenile court under Welfare and Institutions Code section 300, subdivisions (b)(1) and (j).[1] The juvenile court sustained the petition as amended by interlineation, declared K.S. a dependent child, and ordered him removed from the custody of his mother, K.T. (Mother), vesting temporary placement and care with the Agency. Mother filed a notice of appeal, challenging the court's jurisdiction and disposition orders and asserting the court failed to comply with the federal and state Indian Child Welfare Acts.

Finding the Agency failed to satisfy its duty of further inquiry under the federal Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and the California Indian Child Welfare Act (Cal-ICWA) (§ 224 et seq.), we conditionally reverse and remand for further proceedings.[2]

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] As the California Supreme Court explained in *In re Dezi C.* (2024) 16 Cal.5th 1112, 1125, fn. 1 (*Dezi*), we use the term "Indian" as it is used in the federal and state statutes. No disrespect is intended.

FACTS

*A. Events of December 2023 through February 2024*

On December 18, 2023, Mother and her boyfriend, J.D., engaged in a physical altercation that began when Mother asked to see J.D.'s phone. J.D. refused and pushed Mother away with both hands. The following day, Mother and J.D. had another physical altercation. Mother again asked to see J.D.'s phone. In response, J.D. threw the phone and it hit Mother's hand. This time, Mother called the police. When the police arrived, they arrested J.D., who was detained and then released. Mother's minor child, K.S. (then seven years old), was present for both incidents. [3]

Following the altercation, the Agency attempted a welfare check. In late December 2023, a social worker with the Agency called Mother and left a voicemail. Mother left a return message the following day, reporting she and K.S. were on their way to Las Vegas, Nevada and would not be returning until January 4, 2024. The social worker returned Mother's call, but there was no answer, so the social worker texted Mother, asking if she and K.S. could be available for a video call that day. Mother texted back saying she did not have the video call application identified by the social worker but would download a different one during her next stop so they could talk later in the day. The social worker agreed to the plan, but Mother did not call back that day and did not respond to the social worker's text message asking when Mother would be available for the call.

---

[3] K.S.'s father (Father) lives in Florida and has only sporadic contact with K.S. Father submitted to the first amended petition as amended by interlineation and did not appeal any order or ruling.

The same day, the social worker made an unannounced visit to Mother's home. A third party answered the door and told the social worker he was watching the family dog because Mother and K.S. were out of town for the next few days. The following day, Mother sent a text to the social worker, responding to the text message sent on December 28, 2023. Mother said she had just received the voicemail from the social worker and asked if they could have the video call at that time. The social worker handling the case was not at work that day, so the video call did not take place.

The next Tuesday, the social worker received a call from Mother's CalWORKs worker, who reported Mother and K.S. stopped by the CalWORKs office in southern California to report a missing EBT card.[4] The CalWORKs worker called back later that day and informed the social worker Mother had left her car keys in the CalWORKs office and had not returned for them. Later that day, the social worker met, in person, with Mother and K.S. Mother told the social worker she was leaving to return to Las Vegas for a few more days but gave permission for K.S. to be interviewed.

K.S. was interviewed with Mother nearby but not directly next to or in front of him. K.S. reported he lived with Mother and that J.D. stayed over sometimes but did not live in the home. He reported his basic needs were met. He denied there was any fighting in the home. He denied ever seeing J.D. push Mother. He said Mother and J.D. had infrequent verbal arguments. Regarding the December 19, 2023 incident, K.S. said J.D. was

---

[4] California Work Opportunity and Responsibility to Kids (CalWORKS) is a welfare program that provides cash aid and services to eligible California families in need.

upset and threw the phone at the couch but Mother put her hand out and was hit by the phone. He reported feeling safe in the home.

The next contact between Mother and the social worker was the following week, when the social worker sent a text asking when Mother would return from Las Vegas. Mother responded she was not home yet but would let the social worker know when she and K.S. returned. Two days later, the social worker sent another text message to Mother, asking that she have J.D. reach out to the social worker and reminding her a home assessment still needed to be completed. Mother responded by reporting she and K.S. were flying to Wisconsin for three days and she would update the social worker when she returned.

Six days later, the social worker sent a follow-up text message to Mother asking when she and K.S. would be home. Mother did not respond. Six days after that, the social worker sent another text message to Mother. Mother did not respond. Two days after sending that message, the social worker attempted an in-person visit at Mother's local address. No one answered the door, so the social worker left a business card at the door with a note asking for a call. Mother did not call.

A week later, the social worker attempted, twice, to text Mother. Both times, the social worker received the message "'message send failure.'" The social worker also attempted to contact Father at two telephone numbers identified with Father. The first number did not accept calls. The second number belonged to someone other than Father.

Two weeks after that, a newly-assigned social worker learned the police had been to Mother's home twice during the preceding week and found no one there. When police went to the home for a third time later that day, they detained someone named Katherine on a "'5150'" hold because she

appeared to have possible mental health issues or be under the influence of drugs or alcohol. The police reported Katherine was the only person at the home, which "'looked like it was a boarding house for the homeless'" and appeared to be an inappropriate living condition for a child. When the social worker conducted an unannounced visit at Mother's home later that day, Mother did not answer the door. Later that day, Mother called the social worker and reported that Katherine, her mother, had been living in Mother's home for about four days.

B. *K.S. in Wisconsin*

During that same call, Mother informed the social worker she had left K.S. in Wisconsin two to three weeks earlier. She stated she left K.S. with K.K. and A.K., K.S.'s former foster parents who had adopted K.S.'s younger half brother E.K. Mother stated she left K.S. in Wisconsin "because 'things are not healthy'" for him at her home. She reported she was going to leave K.S. in Wisconsin until May 2024 so he could finish the school year. Mother gave K.K. and A.K. a power of attorney for K.S.

The social worker spoke with K.K., who reported K.S. arrived on January 13, 2024. K.K. said Mother called in January and asked for help and they agreed to take K.S. K.K. reported K.S. was doing well in school. He was being evaluated at school for possible behavioral problems, but she had not seen any behavioral or other issues. K.K. said she and her husband were "'100% committed'" to having K.S. in their home. After the telephone conversation, K.K. sent the social worker a text message stating K.S. was now on K.K.'s insurance and had already seen a physician and a behavioral health counselor. In addition, K.S., who had arrived in Wisconsin without his prescription eyeglasses, had an appointment with the eye doctor for the following week. A dentist appointment also had been scheduled.

The social worker spoke with K.S.'s elementary school in Wisconsin. The school reported K.S. was "'doing well, making friendships, kind to his peers, and adjusting well.'" He did not have behavioral issues but was somewhat delayed. K.S., who was at a chronological age for second grade, was placed in first grade because he was behind in both literacy (reading at a pre-k/kindergarten level) and math skills. Wisconsin police conducted a welfare check on K.S. and reported the house was "'more than appropriate for the child'" and K.S. appeared happy.

The social worker also was able to interview K.S. through a video application. K.S. reported he was attending school and was going to start piano lessons. He reported he did not skip meals with his current caregivers, but he skipped meals a "'medium'" number of times when he was living with Mother. K.S. reported when he lived with Mother, sometimes there was no food in the refrigerator. When asked about being homeschooled by Mother, K.S. said "'it was hard for her to teach me. Most day[s] she would try to teach me, but she didn't.'" He also reported Mother sometimes left him alone to go to a convenience store and he witnessed some physical altercations between Mother and J.D. He reported living with Mother was "'sometimes good and sometimes bad.'" It was bad because Mother and J.D. fought and "'it was a mess in the house and the car.'" He said it was good because Mother "'helps [him] with stuff.'" He denied seeing any drugs in Mother's house and denied any sexual abuse.

When asked about Las Vegas, K.S. reported he did not go to Las Vegas in December or January because Mother did not have money for food or gas.

On February 29, 2024, the social worker again interviewed K.K., who reported she had given money to Mother to buy plane tickets to bring

7

K.S. to Wisconsin. The following day, Mother told K.K. the flight had been canceled. K.K. told Mother to use the money for a ticket on another plane, but Mother claimed she had used the ticket money to buy K.S. toys. K.K. reported she had previously given Mother money for specified purposes and had learned from K.S. that Mother did not use the money for those purposes.

## C. K.S.'s Life with Mother

In January 2020, three years before the December 2023 incidents described above, K.S. was removed from Mother's care and taken into protective custody because Mother had exposed K.S. to the negative effects of substance abuse. Family reunification services were ordered. After about 18 months, K.S. was returned to Mother's custody. Subsequently, Mother completed her reunification services and the child welfare case was terminated. Mother was granted sole custody, and Father was given four hours of supervised visitation per month.

After K.S. was returned to Mother's care, allegations of general neglect or physical abuse of K.S. were made on at least six occasions between October 2021 and April 2023. On September 1, 2023, Mother reported J.D. had hit K.S. with a belt on his back, threatened to kill K.S., and shoved narcotics down his mouth. When questioned by the police, K.S. denied J.D. had shoved narcotics down his mouth and reported J.D. hit him with a belt on his bottom, not his back.

In October 2023, a report was made that K.S. was heard yelling for help and screaming "'stop hitting me, you stupid bitch.'" It was reported that sounds of Mother and K.S. screaming had been going on for months and slamming sounds also had been overheard. A welfare check was completed, and Mother told law enforcement K.S. had autism and attention deficit

hyperactivity disorder (ADHD) and had been hitting the door with a skateboard. Mother declined resources.

K.S. reportedly had been homeschooled by Mother for an unknown period of time. Pursuant to his homeschooling agreement, K.S. was to be evaluated every 20 days. As of December 2023, however, K.S. had not submitted any schoolwork and Mother had cancelled seven scheduled school meetings.

Mother reported to the social worker that K.S. has autism and ADHD. However, there was no individualized education plan (IEP) on file for K.S. Mother informed the social worker she withdrew K.S. from school because the school did not recognize K.S.'s autism or provide an IEP. Mother acknowledged she had not been successful at homeschooling K.S.

D. *Mother's History*

Mother has a total of five children—two adults (18 and 21) and three minors. The 21 year old lives with her paternal step grandmother, who obtained legal guardianship when the child was three. The 18 year old has lived with his father since he was three months old. (Mother was homeless at the time and voluntarily gave the child to his father.) The oldest minor (E.T.) is 16 years old and lives with his father, who has full custody. The youngest (two years old) was adopted by K.K. and A.K. and resides with them in Wisconsin. K.S. was the only child living with Mother in 2023.

In addition to her contacts with the Agency regarding K.S., Mother had contact with the Agency in connection with E.T., K.S.'s 16-year-old maternal half-brother. E.T. was declared a dependent of the Los Angeles County Juvenile Court in 2010 because Mother and E.T.'s father (not Father) had a history of domestic violence that endangered E.T.'s physical and emotional health and safety. In addition, Mother had an unresolved history of

9

mental and emotional problems and substance abuse that rendered her periodically unable to provide regular care and supervision for E.T., and E.T.'s father had an unresolved history of substance abuse. In 2011, E.T. was returned to the custody of Mother and E.T.'s father. In 2012, child welfare proceedings were terminated, with E.T. remaining in legal custody of both parents and the sole physical custody of Mother.

Almost a year and a half later, in April 2014, E.T. was again declared a dependent of the Los Angeles County Juvenile Court due, in part, to Mother's unresolved substance abuse and mental and emotional problems. In July 2014, the Los Angeles County Juvenile Court terminated jurisdiction and granted sole legal and physical custody to E.T.'s father.

As to her own history, Mother reported she was in foster care between the ages of 11 and 18. Mother suffered emotional, physical, and sexual abuse as a child, with periods of homelessness and trauma resulting from drugs and violence. Mother reported she has a distant but supportive relationship with her own mother, who has a history of drug and alcohol use. She has infrequent contact with her father, who also has a history of drug and alcohol use.

Mother has a history of substance abuse, including methamphetamine, marijuana, and alcohol use. Mother has admitted to using methamphetamine with K.S. present in her home and driving with K.S. in the car while under the influence. Mother has completed several drug treatment programs but continued to relapse, including during periods while K.S. was in her care.

Mother also has a history of unresolved and untreated mental health issues. She has self-reported diagnoses of bipolar disorder, manic-depressive disorder, autism, anxiety, PTSD, and ADHD and has been in and

10

out of treatment. She also has a history of domestic violence in past relationships.

Mother has been arrested for and/or convicted of, among other things, petty theft, grand theft, possession of a controlled substance, battery, shoplifting, theft of personal property, making or passing a fictitious check, possession of unlawful paraphernalia, possession of burglary tools, second degree burglary, unlawful alteration of a driver's license, and willful cruelty to a child.

### E. Proceedings in Juvenile Court

On February 5, 2024, the Agency filed a non-custody petition on behalf of K.S. based on substantiated allegations of domestic violence between Mother and J.D. Mother was notified of the non-custody petition and the detention hearing scheduled for February 6, 2024 by certified mail. No one appeared for Mother or Father at the hearing. Because K.S.'s whereabouts were unknown, the juvenile court issued a protective custody warrant.

A certified letter was mailed to Mother, notifying her of the detention/warrant review hearing scheduled for February 20. Father also was notified by certified mail. On February 17, 2024, the social worker sent Mother a text message with the detention hearing information, including date, time, and location. A similar message was left for Father.

The warrant review hearing was held on February 20, 2024. Mother, Father, K.S., K.K., and A.K. appeared remotely. Counsel was appointed for Mother, K.S., and Father. Mother and Father denied the allegations of the first amended petition. The juvenile court recalled the warrant, found Father to be the presumed father of K.S., ordered the Agency to conduct an initial inquiry and provide the results to the court, and deferred

11

any finding under ICWA. The hearing was continued for one day to allow Mother to appear in person.

At the continued hearing on February 21, 2024, Mother appeared in person, and Father appeared remotely. The juvenile court again deferred any finding on whether ICWA applied. The court found there was substantial danger to the physical health of K.S. and there were no reasonable means by which K.S.'s physical or emotional health could be protected without removing him from Mother's and Father's physical custody. K.S. was detained from both parents. Mother was given eight hours of supervised electronic visitation per week. Father was given six hours of supervised visitation per week. The Agency was ordered to provide reunification services as quickly as possible. A pretrial hearing was set for March 27, 2024, and trial was set for April 10, 2024.

By stipulation, the March 27, 2024 hearing was continued to April 10, 2024. Later, the trial was continued to April 23, 2024. Mother appeared in person at the trial; Father appeared remotely. Father submitted on the amended petition and agreed to family reunification services.

At trial, the juvenile court admitted the Agency's report as evidence. Among other things, the report contained evidence Mother missed random drug tests several times in March 2024 and on March 25, 2024, notified the social worker that a staff member at the drug testing location had informed her she could not take a drug test on March 19, 2024 because she had been COVID-19 positive and would need a negative COVID-19 test. When the social worker followed up with the drug testing location, she was told no patient had come to the location stating they had contracted COVID-19 and, further, patients did not need to prove they were COVID-19 negative to take a drug test. When asked to provide proof she had been COVID-19

12

positive, Mother provided a test result letter created by a website that creates a positive COVID-19 test based on a self-report of the user. Several days later, Mother reported she had e-mailed the Agency documentation from the doctor showing she had tested positive for COVID-19. However, there were no e-mails from Mother and when the social worker followed up, Mother failed to respond. Mother's call-in compliance as of April 5, 2024, was 47 percent. Mother had failed to sign counseling and parent education referrals and did not demonstrate any effort to comply with the requirement that she attend self-help meetings and participate in a substance abuse program.

Following submission of evidence and argument, the juvenile court found the allegations of the first amended petition true by a preponderance of the evidence and declared K.S. a dependent child of the Orange County Juvenile Court. The court found reasonable efforts were made to remove K.S. from his home and that vesting custody with K.S.'s parents would be detrimental to K.S. The court found K.S.'s placement in Wisconsin was not a parent-initiated placement that obviated the need for court supervision because Mother had not alleviated the current circumstances that created risk to K.S. and there was no evidence the current risk would be mitigated by Mother without court supervision. The court authorized K.S.'s current placement in Wisconsin.

*F.  ICWA*

On January 2, 2024, during her interview with the social worker, Mother reported having Native American ancestry through connections with the White Earth Chippewa tribe and possibly with a Cherokee tribe. On February 16, 2024, the Agency received a text message from Mother stating K.S.'s maternal great-grandmother was registered White Earth Chippewa. At

13

the hearing on February 21, 2024, the court ordered the Agency to continue its efforts to determine whether ICWA applied and deferred any findings.

On February 21, 2024, Mother filed a parental notification of Indian status, notifying the court K.S. might have Native American ancestry through the White Earth Chippewa, Blackfoot, or Cherokee tribes by way of his maternal great-grandmother. On February 22, 2024, Mother notified the Agency she claimed White Earth Chippewa-Anishinaabeg (Minnesota Chippewa Tribe-White Earth Band) ancestry through her father and paternal grandparents and Blackfeet and Cherokee ancestry through her mother and maternal grandfather. Mother denied being enrolled in a tribe and could not identify other relatives who might provide additional information. The Agency did not ask Mother's parents or brothers about K.S.'s possible Native American ancestry.

On March 6, 2024, the Agency sent e-mail inquiries regarding K.S.'s possible Native American ancestry to the Blackfeet Tribe of the Blackfeet Indian Reservation of Montana, Cherokee Nation, Eastern Band of Cherokee Indians; United Keetoowah Band of Cherokee Indians in Oklahoma; and the Minnesota Chippewa Tribe—White Earth Band. As of April 17, 2024, the Blackfeet Tribe and Minnesota Chippewa Tribe had not responded to the inquiry, while the Cherokee Nation, the Eastern Band of Cherokee Indians, and the United Keetoowah Band responded K.S. was not eligible for membership. On April 23, 2024, the court found ICWA did not apply.

14

DISCUSSION

I.

SUBSTANTIAL EVIDENCE SUPPORTS THE DISPOSITION ORDER[5]

Following trial, the juvenile court declared K.S. a dependent child of the juvenile court. The court found, by clear and convincing evidence, that section 361, subdivision (c)(1) applied and reasonable efforts had been made "to prevent or eliminate the need for removal" of K.S. from his home under section 361, subdivision (d).

Section 361 allows the juvenile court to limit a parent's control over a child who has been adjudged a dependent child of the court. (*Id.*, subd. (a).) Subdivision (c) of section 361 allows removal of a dependent child from the physical custody of his or her parents only where the juvenile court makes at least one of five specified findings by clear and convincing evidence. As relevant here, a child may be removed from his home if the court finds "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, *and* there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (*Id.*, subd. (c)(1), italics added.) The

_____

[5] Mother's notice of appeal and opening brief state that Mother is appealing both the jurisdiction and disposition orders. Mother's argument, however, is limited to the juvenile court's disposition order under section 361, subdivision (c) and does not address the juvenile court's jurisdiction under section 300, subdivisions (b)(1) and (j). Accordingly, Mother's jurisdictional challenge under section 300 is forfeited. (Cal. Rules of Court, rule 8.204(a); *Martine v. Heavenly Valley Limited Partnership* (2018) 27 Cal.App.5th 715, 728 ["'[w]hen legal argument with citation to authority is not furnished on a particular point, we may treat the point as forfeited and pass it without consideration'"].)

court is required to "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home . . . ." (*Id.*, subd. (e).)

We review a removal order under the substantial evidence standard. (*In re M.D.* (2023) 93 Cal.App.5th 836, 856–857.) "Because section 361, subdivision (c), requires proof by clear and convincing evidence, we must determine 'whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.' [Citations.] 'We do not evaluate the credibility of witnesses, attempt to resolve conflicts in the evidence or determine the weight of the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is other evidence supporting a contrary finding.' [Citation.] The party challenging the juvenile court's order has the burden to show there is insufficient evidence to support the court's decision." (*Id.* at p. 857.)

Mother argues the juvenile court's disposition order was not supported by substantial evidence because she had obviated the "substantial danger" to K.S. by the "reasonable means" of placing him in Wisconsin before the hearing. (§ 361, subd. (c)(1).) Mother does not deny K.S. faced substantial danger in her home; indeed, she acknowledges that is why she removed him. She argues the court should have accepted her "reasonable means," left K.S. in her custody, but ordered that K.S. remain in Wisconsin until Mother could show her home was safe.

Mother does not cite any authority supporting this argument. Instead, she offers two cases, *In re David M.* (2005) 134 Cal.App.4th 822 and *Nahid H. v. Superior Court* (1997) 53 Cal.App.4th 1051, where children were removed from their parents' physical custody because of past risk or

16

speculative future risk. The issue here was neither past risk nor speculative future risk. As mother concedes, her physical custody of K.S. presented an immediate substantial danger. By her own acknowledgement, that is why she removed K.S. to Wisconsin.

Mother also relies on *In re Ashly F.* (2014) 225 Cal.App.4th 803 to support her claim that voluntary placement of K.S. in Wisconsin was "'a reasonable means'" of protecting K.S. The case is not helpful to Mother, however. In *In re Ashly F.,* the children were removed from a home after physical abuse by their mother. The appellate court found the removal was improper because the court had failed to consider existing reasonable means of protecting the children "in their home," including the option of removing the mother from the home, leaving the children with their father. (*Id.* at p. 810.) Here, Mother was K.S.'s sole caretaker and if she were removed from the home, no one would be left to care for K.S.

There is substantial evidence to support the juvenile court's findings that (1) there was substantial danger to K.S. if he were returned to Mother's custody and (2) there were no reasonable means to protect K.S. without removing him from her custody. Mother, who had a history of domestic violence, exposed K.S. to physical altercations between herself and her boyfriend. When the police visited Mother's home in February 2024, they described the home as looking like "'a boarding house for the homeless'" and described it as an inappropriate living condition for a child. K.S. reported he missed meals when living with Mother, that sometimes there was no food in the refrigerator, and that he was left alone when Mother went to the store. Mother removed K.S. from school to homeschool him, but acknowledged she was not successful at homeschooling K.S. K.S. reported that Mother tried but failed to teach him most days, K.S. had not submitted any schoolwork for

review, Mother failed to present K.S. for evaluation every 20 days as agreed and had cancelled seven meetings with the entity reviewing her homeschooling. Further, Mother has a history of substance abuse, with several relapses after drug treatment programs and a history of unresolved and untreated mental health issues.

We find no error in the juvenile court's finding that reasonable efforts were made to prevent or eliminate the need for removal of K.S. from his home.

## II.

### THE JUVENILE COURT DID NOT SATISFY ITS DUTY OF FURTHER INQUIRY

Mother contends the juvenile court's finding that ICWA did not apply was erroneous because: (1) the Agency did not meet its duty of further inquiry, including questioning additional family members and (2) two of the potential tribes had not responded to the Agency by the trial date.

"In 1978, Congress enacted [ICWA] to 'formalize[] federal policy relating to the placement of Indian children outside the family home.' [Citation.] Under ICWA's state analogue, the California Indian Child Welfare Act (Cal-ICWA; [citation]), courts and child welfare agencies are charged with 'an affirmative and continuing duty to inquire whether a child . . . is or may be an Indian child' in dependency cases. [Citation.] Child welfare agencies discharge this state law duty by 'asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled.'" (*Dezi, supra*, 16 Cal.5th at pp. 1124–1125.)

"'[E]xtended family member'" includes, among other persons, uncles and grandparents. (25 U.S.C. § 1903(2); see § 224.1, subd. (c).) A duty

18

of *further inquiry* exists when "the court, social worker, or probation officer has *reason to believe* that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is reason to know that the child is an Indian child . . . ." (§ 224.2, subd. (e), italics added.) There is reason to believe a child is Indian when there is "information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe." (*Id.*, subd. (e)(1).) The further inquiry required includes, but is not limited to, interviewing parents and extended family members, contacting the Bureau of Indian Affairs and the State Department of Social Services for assistance, and contacting the relevant tribe and "any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility." (*Id.*, subd. (e)(2)(C).)

Based on Mother's report of Native American ancestry, there was reason to believe K.S. was an "Indian child" within the statutory meaning, and the Agency was under a duty of further inquiry. The Agency did not satisfy that duty because it did not interview Mother's parents or brothers.

Mother further argues the Agency did not satisfy the duty of further inquiry because two of the tribes identified by Mother as having a possible connection to K.S. had not responded by the trial date. Citing *In re M.W.* (2020) 49 Cal.App.5th 1034, the Agency argues that because no response had come within six weeks, the duty was satisfied. In *In re M.W.*, the Agency telephoned and twice faxed one tribe and mailed and twice e-mailed the other tribe. (*Id.* at pp. 1046–1047.) The record here shows the Agency sent the ICWA inquiry simultaneously by e-mail and certified mail to the tribes, but it does not show any other contact or attempt to follow up. Given the amount of information provided by Mother regarding K.S.'s

19

possible Native American ancestry, the simultaneous transmission of an ICWA inquiry by e-mail and certified mail, without any further attempt to follow up, did not satisfy the Agency's duty of further inquiry.

Under *Dezi*, we conditionally reverse the juvenile court's disposition order and remand the matter for further inquiry as required by ICWA and Cal-ICWA. (*Dezi, supra*, 16 Cal.5th at pp. 1151–1152.)

## DISPOSITION

The juvenile court's April 23, 2024 disposition order is conditionally reversed. The matter is remanded to the juvenile court for compliance with the inquiry and notice requirements of sections 224.2 and 224.3. After inquiry has been made, the court shall make ICWA findings at a noticed hearing. If evidence of K.S.'s Native American ancestry is uncovered, the court shall proceed in conformity with ICWA and related California law. If not, the court shall immediately reinstate its April 23, 2024 order.

GOODING, J.

WE CONCUR:

O'LEARY, P. J.

GOETHALS, J.

20